652 P.2d 1023

**POLARIS INTERNATIONAL METALS CORPORATION, a corporation; James Concannon, Plaintiffs-Appellants,**

v.

**The ARIZONA CORPORATION COMMISSION; Bud Tims, Stan Akers and Jim Weeks, individually and as members of the Arizona Corporation Commission; and Matthew J. Zale, individually and in his capacity as Director of Securities of the Arizona Corporation Commission, Defendants-Appellees.**

No. 15830.

Supreme Court of Arizona, In Division.

Sept. 27, 1982.

Rehearing Denied Nov. 2, 1982.

Richard L. Keefe, Walter J. Grace, III, Norris L. Ganson, Tucson, for plaintiffs-appellants.

Robert K. Corbin, Atty. Gen., Patrick M. Murphy, Chief Counsel, John C. Dutton, Jr., Asst. Atty. Gen., Financial Fraud Div., Phoenix, for defendants-appellees.

GORDON, Vice Chief Justice:

Polaris International Metals Corporation [Polaris] and James Concannon, President of Polaris, filed a declaratory judgment action against appellees. The purpose of the action was to: (1) void the Arizona Corporation Commission's [the Commission] Cease and Desist Order with Docket No. S–1343–I issued March 26, 1971; (2) hold A.R.S. § 44–1841 unconstitutional to the extent it applies to interstate commerce; (3) rule that Polaris' stock sales from January 1, 1973 to the time the complaint was filed were within the exemptions of A.R.S. § 44–1844; and (4) find the Commission's investigation of Polaris unreasonable and order it restrained. From the trial court's order of April 21, 1980 granting appellees' Motion to Dismiss, appellants appeal. The thrust of the motion was that appellants had failed to state a claim for which relief could be granted, Ariz.R.Civ.P. 12(b)(6). Taking jurisdiction pursuant to Ariz. Const. Art. 6, § 5(3) and Ariz.R.Civ.App.P. 19(e), we affirm in part and reverse in part the trial court's order and remand for further proceedings consistent with this opinion.

## FACTS

In reviewing an order granting a motion to dismiss under Ariz.R.Civ.P. 12(b)(6), it is well-settled that the facts pleaded by the plaintiff are considered true. Therefore, for the purposes of this appeal, we rely only on appellants' version of what transpired before the complaint was filed.

Correspondence in the record indicates that the Commission first became involved with Polaris in 1961. The present controversy did not begin, however, until 1971. On March 26, 1971, the Commission entered a cease and desist order against Polaris. Polaris had been selling unregistered securities through unregistered salespeople to finance the development of a pilot plant that would test a new steel making process. The Commission ordered Polaris to stop engaging in any act related to the sale of securities until the company registered its securities, sales personnel, and advertising material pursuant to the appropriate Arizona statutes and rules.

On April 7, 1971, Polaris' attorney sent a letter requesting the Commission to clarify its order and to retract allegedly false statements made by Commission representatives to a Polaris stockholder and to Tucson security brokers. Having received no response to the letter, the attorney telephoned the Commission on April 25 and was promised an answer to his letter. No answer was ever received.

Polaris obtained the help of an Arizona state senator who arranged a meeting between the Commission and Polaris on December 15, 1971. Polaris claims that at that time a Commission representative made more false statements about Polaris (concerning alleged investigations by federal and Louisiana securities agencies) and refused to clarify or vacate the cease and desist order.

The Arizona Legislature amended A.R.S. § 44–1844(1) in 1972 to exempt private offerings of securities from the securities registration requirements. Polaris believed that its prior security offerings had been private, and on June 1, 1973 again began to issue and sell stocks in what it contends were private offerings.

In July, 1974, Polaris scheduled two meetings with a corporation commissioner who

cancelled one meeting after Polaris' representatives had arrived in Phoenix from Tucson and ended the other meeting after fifteen minutes so that he could make a prior engagement. The same state senator who had previously interceded on Polaris' behalf then wrote a letter to the Commission requesting a prompt resolution of the Polaris matter. The Commission responded but said that the matters concerning Polaris were still under investigation and requested Polaris to turn over records to the Commission.

Polaris was attempting throughout this period to have the 1971 cease and desist order vacated. The company asserted that the order was "needless" because recission offers had been made to all shareholders who bought stock before the 1971 order was entered and all stock sold thereafter was within the A.R.S. § 44–1844(1) exception. Vacation of the order was requested because stock reports on Polaris listed the order as being in force which damaged Polaris' business reputation. Polaris claimed that problems in its negotiations with other companies and investors were directly linked to the continued existence of the cease and desist order.

In August or September of 1975, the Tucson Police Department and Pima County Attorney's Office began to investigate Polaris in earnest. The record is replete with affidavits of Polaris shareholders who state that they were dragged away from their jobs by investigators but told the investigators that they were not dissatisfied with their investments in Polaris which were made with the knowledge that they were high risk investments.

On May 21, 1976, a search warrant was executed against Polaris and all of its business records were seized. The warrant was based in part on an affidavit by a Commission agent that Polaris alleges contained false statements. A deputy county attorney took the case to a grand jury in October, 1976, but the grand jury was dismissed

before it could vote on whether to return an indictment. In November, 1976, a criminal complaint was filed against appellants charging them with violating Arizona's securities laws and the Commission's 1971 order. On appellants' motion, the complaint was dismissed without prejudice on June 2, 1977 for failure to sufficiently specify the time during which the alleged offenses took place.

Polaris and sixty shareholders then filed a civil suit in Pima County in the summer of 1977 to enjoin the City of Tucson and the Pima County Attorney from further investigating Polaris. Apparently, the suit was settled when the defendants in that suit agreed to cease the investigation. The defendants, however, sent all the material acquired during the investigation to the Commission for further action.

During the fall of 1975, Polaris and various persons on its behalf attempted informally and formally to have the Commission hold a hearing on the Polaris controversy. Polaris attempted again to obtain hearings in 1977 (informally) and in 1978 (formally). These requests were also in vain. The 1978 request was denied by a formal Commission order dated October 13, 1978 and also bearing Docket No. S–1343–I. Polaris' attorneys have avowed that the first time anyone associated with the company saw this order was when appellees attached it as an exhibit to their Motion to Dismiss in this case.

During 1978 and 1979, the Commission had issued several subpoenas duces tecum to gather information from Polaris and its bank. Polaris continued its contacts with the Commission in 1979 and 1980 and offered to give the Commission the information it requested and have Polaris' officers testify before the Commission if the Commission would grant Polaris a hearing and promptly (within six months) conclude the investigation.[1]

Polaris filed a civil complaint against the Commission on September 28, 1978. The

---

1. We note that Polaris attached a number of conditions to these offers, several of which the Commission could reasonably find objectiona-

ble. The Commission simply declined the offers, however, without negotiating over the conditions.

complaint requested that a subpoena issued by the Commission on September 14, 1978 be quashed, that any further investigation of Polaris by the Commission be enjoined until the Commission could show a need for further inquiry, that the Commission be ordered to grant a formal hearing on whether to vacate the 1971 order, and that certain statutes be declared unconstitutional. The trial court entered judgment which denied Polaris any relief except that the Commission's further investigation under the subpoena in issue was ordered to be for a reasonable time only.

The instant case was commenced by civil complaint filed May 14, 1979. From a grant of appellees' Motion to Dismiss, appellants brought this appeal to raise the issues whether their complaint states a proper claim for declaratory judgment and whether Polaris was denied due process in the sense of the right to appeal when the Commission failed to send Polaris a copy of its October 13, 1978 order denying Polaris a hearing. These issues are considered separately below.

### DECLARATORY JUDGMENT

Parties may bring actions under A.R.S. § 12–1831 et seq. to obtain a declaration of their rights or status vis-a-vis a statute or administrative order. A.R.S. § 12–1842 states that the declaratory judgment article is remedial and should be liberally construed and administered.

> "But even though the act is remedial and is to be liberally construed, it is well settled that a declaratory judgment must be based on an actual controversy which must be real and not theoretical. * * * A 'justiciable controversy' arises where adverse claims are asserted upon present existing facts, which have ripened for judicial determination."

*Planned Parenthood Center of Tucson, Inc. v. Marks,* 17 Ariz.App. 308, 310, 497 P.2d 534, 536 (1972) (citations omitted).

Appellees have argued here and below that appellants are not entitled to declaratory judgment relief because appellants do not allege a present, actual controversy but rather seek an advisory opinion. Appellees also assert that appellants have failed to exhaust their administrative remedies. We must examine these arguments in the context of each request for relief raised by appellants.

### 1. VALIDITY OF CEASE AND DESIST ORDER

Appellants seek to have declared void the Commission's Cease and Desist Order of March 26, 1971. They argue that: (1) the wording of the order prohibits Polaris from making *any* stock sales; (2) the Legislature, subsequent to the order, amended A.R.S. § 44–1844 to allow the type of sales in which Polaris wishes to engage; and (3) therefore, the order is void because it prohibits what the Legislature expressly allows. Appellants seek this relief so that they cannot be prosecuted under A.R.S. § 44–2036 (which provides a penalty for violation of Commission orders) if they make a stock sale within the A.R.S. § 44–1844(1) exemption.

We agree with appellees that appellants have yet to exhaust their administrative remedies in this regard. Because it is the Commission's order that is involved, the Commission is in the best position to interpret that order in light of the 1972 amendment to A.R.S. § 44–1844. Allowing the Commission to review its order before judicial intervention permits it to correct any mistakes there might be and thereby possibly avoids litigation over the order. *Herzberg v. David,* 27 Ariz.App. 418, 555 P.2d 677 (1976).

It is true that Polaris unsuccessfully has informally and formally sought to have the Commission review its order. For example, on September 11, 1978, appellants filed a formal notice for a hearing to allow them to supply information regarding Polaris and to have the Commission vacate the cease and desist order. We hold that due process requires that appellants still be allowed to appeal the Commission's October 13, 1978 denial of that request. Appellants will not have exhausted their administrative remedies concerning the order until it is deter-

mined if the Commission must conduct a hearing, and, if so, until the Commission acts on the request to vacate the order. At this time, declaratory judgment relief concerning the cease and desist order would be premature.

2. CONSTITUTIONALITY OF A.R.S. § 44–1841.

■ A.R.S. § 44–1841(A) forbids the sale of nonexempt, unregistered securities within or from the State of Arizona. Appellants contend that to the extent the statute regulates the sale of securities outside Arizona, it conflicts with the federal Commerce Clause, U.S. Const. Art. I, § 8. If this were true, at least that portion of the statute would be unconstitutional under the federal Supremacy Clause, U.S. Const. Art. VI.

Appellants do not allege how they are affected by the portion of the statute to which they object. There is no evidence that they have sold or will sell nonexempt securities from Arizona to some other place. Thus, appellants raise a "mere difference of opinion as to the constitutionality of legislation" which is an insufficient interest to obtain a declaratory judgment. *Manning v. Reilly,* 2 Ariz.App. 310, 314, 408 P.2d 414, 418 (1965).

3. VALIDITY OF STOCK SALES POST–JANUARY 1, 1973

■ Appellants seek to have all of their sales of stock since January 1, 1973 declared valid as within an exemption of A.R.S. § 44–1844. If appellants' sales are not within the exemptions of A.R.S. § 44–1844, they may be subject to criminal prosecution under A.R.S. § 44–1841 for selling nonexempt, unregistered securities. To support their claim that a declaratory judgment is appropriate, appellants rely on the following quotation from *Planned Parenthood Center of Tucson, Inc., supra.*

> "To require statutory violation and exposure to grave legal sanctions; to force parties down the prosecution path, in effect compelling them to pull the trigger to discover if the gun is loaded, divests them of the forewarning which the law, through the Uniform Declaratory Judgments Act, has promised. Begrudging

availability of the declaratory vehicle is inconsistent with the Act's expressed remedial tenor directed to the elimination of uncertainty and insecurity and the settlement of controversy. Whenever facts are present justifying prosecution, prosecution will serve to test the statute and tell the whole story. A declaratory judgment in such case is ordinarily as superfluous as medicine administered to a corpse. Violation of a criminal statute as a prerequisite to testing its validity invites disorder and chaos and subverts the very ends of law. The court will not indulge in the fomentation of lawlessness."

17 Ariz.App. at 312–13, 497 P.2d at 538–39.

The *Planned Parenthood Center of Tucson, Inc.* case is quite different from the instant case. The plaintiffs in *Planned Parenthood* sought to determine the constitutionality of several criminal statutes proscribing abortions. There was no question that if the plaintiffs engaged in their planned conduct, they would be in violation of the statutes. Also, the local county attorney had made it clear that the statutes would be enforced. The only question raised by plaintiffs was whether the state could constitutionally prohibit the conduct in question. If the plaintiffs asserted what they believed to be their constitutional rights, they were faced with certain prosecution. In that context, the Court of Appeals held that the declaratory judgment statutes could be used to settle in a civil context an actual controversy over essentially a question of constitutional law. The alternative would have been to force the plaintiffs to break the law and then to have subjected them to criminal penalties if they were unsuccessful on their constitutional challenge.

Appellants here are situated differently. Although they have been investigated, they have not been threatened with certain prosecution. The question they raise has no constitutional underpinnings. The validity of A.R.S. § 44–1844 is not challenged. Rather, appellants seek advice on what is essentially a factual question—whether the

sales they have conducted since January 1, 1973 came within the exemptions provided in A.R.S. § 44–1844. Appellants do not face the immediate threat to their constitutional liberties that were faced by the plaintiffs in *Planned Parenthood.* The declaratory judgment statutes cannot be used to make the courts a fountain of advice for the future conduct of our citizens. While we commend appellants for seeking to determine the legality of their conduct before they embark on a particular course, under the facts of this case, the courts are not the appropriate forum for that determination.

4. REASONABLENESS OF THE INVESTIGATION

Appellants' complaint requests that the Commission's investigation of them be declared unreasonable as to time and manner and that the Commission be restrained from further investigation. As to this allegation, the complaint does state a claim for which relief could be granted.

The Commission derives its power to investigate both from the state constitution, Ariz. Const. Art. 15, § 4, and from statutes, A.R.S. §§ 44–1822 to 44–1825. These provisions give the Commission broad powers to conduct public or private investigations to determine whether any person or corporation has violated or is about to violate Arizona's securities laws.

The United States Supreme Court has said that the investigatory powers of administrative agencies are analogous in their breadth to those of the grand jury. *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950). An appropriately empowered agency "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* at 642–43, 70 S.Ct. at 364, 94 L.Ed. at 411.

Hence, courts have given agencies wide berth in reviewing the conduct of administrative investigations. In fact, although courts have examined the issuance of subpoenas for material or testimony by agencies and have occasionally refused to enforce them, our research has failed to uncover any case in which a court interceded

and halted an agency's investigation altogether. But we do not believe the courts are without authority under any circumstances to limit or stop an agency's investigation. In discussing the federal agency that investigates securities cases, the Second Circuit Court of Appeals opined in dictum, "It is true that while the S.E.C. is entitled to great freedom in conducting its investigations, it is not at liberty to act unreasonably, and in appropriate circumstances the court may inquire into the reasons for an investigation and into its effects." *S.E.C. v. Brigadoon Scotch Distributing Co.,* 480 F.2d 1047, 1056 (2d Cir.1973).

Courts must have the power to curb administrative investigations in appropriate instances. The great freedom provided by our democratic system is possible only because our federal and state constitutions have created a government controlled by checks and balances. We have vested our officials with extensive powers to enable them to govern us, but we have also designed the system so that no branch of government has unlimited powers. Neither the federal nor state executive branch and its administrative agencies can expand their powers beyond their constitutional or statutory limits and begin an untramelled interference with our liberties because our constitutions allow the legislature and the judiciary to check the executive exercise of power.

When an Arizona administrative agency unreasonably infringes on the liberties of a corporation, its officers, and its shareholders, it is the Arizona courts who must be able to curb the abuse of power. The Corporation Commission has been treated as a fourth branch of government in Arizona. *Arizona Corporation Commission v. Superior Court,* 105 Ariz. 56, 459 P.2d 489 (1969); *Selective Life Insurance Co. v. Equitable Life Assurance Society,* 101 Ariz. 594, 422 P.2d 710 (1967). However, the system of checks and balances does not rely solely on one branch to restrain its own agents within the proper constitutional limits. The legislature deals with broad issues effecting large segments of the population, and it

may not enact a local or specific law. Ariz. Const. Art. 4, Part 2, § 19. It is the courts that have the function of protecting our constitutional liberties by upholding them in individual cases or controversies. Being receptive to an individual's claim of unfair treatment by the state or federal government is part of the American judiciary's heritage. Thus, if an administrative agency's investigation becomes a tool of harassment and intimidation rather than a means to gather appropriate information, the appropriate court may intrude and stop the incursion into the constitutional liberties of the parties under investigation.

We find instruction in *Shasta Minerals & Chemical Co. v. S.E.C.,* 328 F.2d 285 (10th Cir.1964). At issue in *Shasta Minerals* was a subpoena issued by the S.E.C. to a company. When the company refused to comply, the S.E.C. brought a court action to enforce the subpoena. Both parties moved for summary judgment. The S.E.C. relied only on its investigative power to demand enforcement of the subpoena and declined to give any explanation for its actions. The company filed affidavits "showing a systematic persecution and harassment of [the company] and of its president." 328 F.2d at 287. The affidavits also stated that the S.E.C. had told the company that it would never be allowed to register under the federal securities laws. Because the S.E.C. had not controverted these allegations nor offered an explanation for its actions, the allegations were presumed true for purposes of the summary judgment motion. The appellate court held that in such circumstances, granting summary judgment in favor of the S.E.C. was improper because the allegations supported a claim that the S.E.C. had acted arbitrarily and beyond its authority.

The *Shasta Minerals* case is distinguishable from the case in question because it involved the enforcement of a subpoena which requires court approval whereas an administrative investigation in general does not. But the central issue in *Shasta Minerals* is identical to the one presented here by appellants—can an agency use its investigative powers to harass a company and, for reasons unrelated to the agency's legitimate purposes, obstruct or destroy its ability to conduct its business? Appellants have alleged a lengthy and intrusive course of harassment by the Commission's representatives accomplished under the guise of a securities investigation. The length and intensity of the investigation, the allegedly false statements made about Polaris, and the refusal of the Commission to hear Polaris' side of the case either formally or informally are all evidence from which it might be inferred that the Commission is acting arbitrarily and beyond its authority. In the record, the following portion of a newspaper article appears:

" 'The state can make it tough to impossible for a company to issue securities simply by restrictions and policies,' said a[n] [Arizona corporation] commission source. 'It's a good way to keep out promoters.'

" 'If you make it tough enough for a promoter long enough, maybe he'll go away; but [appellant] Concannon didn't go away,' said the official who concurred with the assessment that the commission's investigation was unnecessarily delayed."

The Arizona Republic, *Pima Probe of Firm Unfair, 'Little Guy' Says,* Oct. 3, 1976, at A–4, cols. 2–3.

If appellants' allegations are true, and we must assume they are for purposes of reviewing the granting of a motion to dismiss for failure to state a claim, the Commission has acted at least as arbitrarily and as far beyond its authority as did the S.E.C. in *Shasta Minerals, supra.* The Commission is empowered to investigate for purposes of enforcing the securities laws; the Commission has no authority to determine on a basis other than compliance with the securities laws those persons or corporations who may conduct business in Arizona. The Commission may not constitutionally use its investigatory powers to harass, intimidate, and defame a business into leaving the state. If the Second Circuit Court of Appeals was correct in *Brigadoon Scotch Distributing Co., supra,* that there are cases where an agency's actions are so unreason-

able that a court may inquire into them, then appellants surely allege such a case. The trial court erred in dismissing appellants' complaint for summary judgment as to this claim.

## DUE PROCESS

 Appellants argue for the first time on appeal that they were denied due process when the Commission failed to notify them that it had denied on October 13, 1978 appellants' formal request for a hearing. Appellants' attorneys avow that the first time anyone associated with Polaris had notice of the denial was when appellees attached a copy of it to their motion to dismiss in the instant case.

If this allegation is true, appellants were denied due process. Under either the version of A.R.S. § 44–1981 in effect in 1978 or the amended version enacted in 1980, appellants have a right to appeal any final order of the Commission. Both statutes contain a time limit within which an appeal must be filed. The right to appeal is meaningless if the time for appeal could run before the appellant received notice that there is an order from which to appeal. The current version of A.R.S. § 44–1981 incorporates A.R.S. § 12–904 which expressly provides that the time for appeal does not begin to run until the appealable decision is served on the party adversely affected. Due process notions of fundamental fairness require us to construe the prior version of A.R.S. § 44–1981 similarly. Thus, appellants have or had twenty days from the service of the order on them to appeal the order. If on remand the trial court finds that the order has never been served, it should require the Commission to serve the order on appellants who would then have twenty days in which to file a notice of appeal.

The trial court's grant of appellees' Motion to Dismiss is affirmed as to all of appellants' claims except the claims that the Commission's investigation has become unreasonable. As to the unreasonable investigation claims, the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.

Appellants' claim of a denial of due process by infringement of the right to appeal is also remanded for further proceedings.

HAYS and CAMERON, JJ., concur.