763 P.2d 527

The ARIZONA CORPORATION COM-
MISSION, Plaintiff-Appellee,

v.

MEDIA PRODUCTS, INC., a Delaware
corporation, Defendant-Appellant.

No. 1 CA-CIV 9655.

Court of Appeals of Arizona,
Division 1, Department C.

June 16, 1988.

Review Denied Nov. 22, 1988.

464

Robert K. Corbin, Atty. Gen. by Patrick M. Murphy, Chief Counsel, Financial Fraud Div., and W. Mark Sendrow, Sharon A. Fox, Asst. Attys. Gen., and Bradley S. Carroll, Sp. Asst. Atty. Gen., Phoenix, for plaintiff-appellee.

Brown & Bain, P.A. by C. Randall Bain and Jennifer B. Beaver, Phoenix, for defendant-appellant.

Carson, Messinger, Elliott, Laughlin & Ragan, Evans, Kitchel & Jenckes, P.C., Fannin, Terry, Hay & Lemberg, P.A., Fennemore Craig, P.C., Phoenix, Furth, Fahrner, Bluemle & Mason, Scottsdale, Gaston, Snow, Moya, Bailey, Bowers & Jones, Phoenix, Hecker, Phillips & Hooker, Tucson, Jennings, Strouss & Salmon, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Storey & Ross, P.C., Streich, Lang, Weeks & Cardon, P.A., Phoenix, for amici curiae.

## OPINION

SHELLEY, Judge.

The Arizona Corporation Commission (Commission) brought this action under the Securities Act (Act) to enjoin the initial public stock offering of Media Products, Inc. (Media), for civil penalties under A.R.S. § 44–2037, restoration to investors of amounts paid for Media stock, and other related relief. The offering was not registered in the State of Arizona. The parties stipulated to consolidate the preliminary injunction request with the trial of all other matters raised in the complaint. Prior to trial, the court bifurcated the liability and remedies portion of the case and proceeded to try only the liability issues. We summarize the trial court's conclusions as follows:

1. That A.R.S. § 44–1841 required the registration of securities sold entirely to persons residing outside of the state by an underwriter located outside of the state on behalf of a foreign corporation having a base of operations in Arizona; and

2. That Arizona has a sufficient state interest in the issuance of securities by a company with a base of operations in the state, even though it was incorporated in the State of Delaware so that Arizona's prohibition of the sale of Media Products stock in other states is not an impermissible burden on interstate commerce in contravention of the United States Constitution.

The trial court entered a final appealable order pursuant to rule 54(b), Arizona Rules of Civil Procedure, adjudging that Media had violated the securities laws of Arizona by failing to register the sale of its initial public offering with the Commission. The court reserved determination of any applicable remedies following appeal. Media timely appealed.

Media is a Delaware corporation with its principal offices in Arizona. It entered into a "Selling Agency Agreement" with First Devonshire Securities, Inc. of Spokane, Washington, wherein the "agent" agreed, on a "best efforts, all-or-none" basis, to sell its initial public stock offering of 1,300,000 shares of common stock. Media's offering was properly registered with the federal Securities and Exchange Commission (SEC). Media's offering was also duly registered under applicable Blue Sky laws in California, Colorado, Connecticut, Georgia, Idaho, Illinois, Minnesota, Montana, New Jersey, New York, Oregon, Pennsylvania and Washington. It made application to the Securities Division of the Commission to register the offering in Arizona but subsequently withdrew its application. The agent as underwriter then informed the Securities Division that it would proceed with the offering in the states where registration had been accomplished. The Securities Division informed Media that such an offering would constitute a violation of the Act. Media then informed the Securities Division that it would proceed, as it did not agree with the Division's interpretation of the Act.

Sales of the entire issue were negotiated out-of-state solely by the out-of-state agent

underwriter and its selling out-of-state broker-dealers with purchasers who were residents of states where the offerings were duly registered. No sales or offers of sale were made in Arizona or to Arizona residents. There is no contention that the offerings were fraudulent.

■ In reviewing the trial court's conclusions of law, this court is not bound by those conclusions, and we will determine questions of law independently of the trial court. *Gary Outdoor Advertising v. Sun Lodge, Inc.*, 133 Ariz. 240, 242, 650 P.2d 1222, 1224 (1982).

## I.

The first issue on appeal is:

Did the court err as a matter of law in interpreting A.R.S. § 44–1841 to prohibit the sale of securities by a foreign corporation having a base of operations in Arizona where (i) all of the sales activities were conducted by out-of-state broker-dealers in states other than Arizona, (ii) the offers to purchase were made and accepted out-of-state, and (iii) no sale or offer of sale was made to any resident of Arizona?

Arizona Revised Statutes § 44–1841(A) reads:

**Sale of unregistered securities prohibited; classification**

It is unlawful to sell or offer for sale within or from this state any securities unless such securities have been registered by description under §§ 44–1871 through 44–1875 or registered by qualification under §§ 44–1891 through 44–1900, except securities exempt under §§ 44–1843 or 44–1843.01 or securities sold in exempt transactions under § 44–1844.

Media posits that A.R.S. § 44–1841 is inapplicable to the Media offering because the offers to sell and the sales were not made within or from the State of Arizona. Media and *Amici Curiae* assert that in interpreting A.R.S. § 44–1841, the court should look to the interpretation of the California Blue Sky Statutes by the Califor-

nia Department of Corporations. They cite A.R.S. § 44–1815, which reads:

The director shall cooperate with the administrators of the securities laws of other states and of the United States with a view to achieving maximum uniformity in the interpretation and enforcement of *like* provisions of the laws administered by them. (Emphasis added)

The pertinent California statute states in detail under what circumstances an offer to sell or sale of securities is considered to be made within or to originate from that state. Arizona Revised Statutes § 44–1841 only states that "It is unlawful to sell or offer to sell within or from this state any securities unless such securities have been registered ..." The pertinent California statute does not contain provisions "like" A.R.S. § 44–1841. As a result, the California Department of Corporations' interpretation of its statute is irrelevant.

■ The key words in our statute are "sell or offer for sale within *or from* this state any securities unless such securities have been registered ..." A.R.S. § 44–1841. Media posits that the Commission created a legal fiction in holding that the sale took place *from* Arizona because the issuer only performed ministerial actions from its base of operations in Arizona. We disagree. The following actions by Media took place within the State of Arizona:

1. The principal place of business and base of operations for Media is in Arizona.

2. The officers and directors operated from and reside in Arizona.

3. The stock certificates were prepared and issued by the transfer agent in Arizona.

4. The Board of Directors' meetings took place in Arizona.

5. The Selling Agency Agreement stated: "[N]otice given pursuant to any of the provisions of this Agreement shall be in writing and shall be delivered (a) to the Company at the office of the Company, 3230 East Roeser Road, Phoenix, Arizona 85040, Attention: David J. Riddle ..."

6. The agreement designated an Arizona bank as the escrow agent.

7. The agreement states:

## VI. PAYMENT AND DELIVERY

A. Payment for the one million three hundred thousand (1,300,000) Shares shall be made to the Company at the offices of Lukins & Annis, P.S., by the Escrow Agent by certified or bank cashier's check in United States currency, same day funds, upon satisfying the conditions of escrow and upon delivery to the Escrow Agent of certificates for such Shares, registered in such name or names and in such denominations as the Agent shall have requested, in all cases against the signed receipt of the Escrow Agent. The Company shall pay to the Agent from funds paid to it by the Escrow Agent the agreed commission provided for hereinabove. *The date on which the sale of securities described in this Section A of Article VI occurs is herein referred to as the "Closing Date."*

B. *The Company agrees to cause certificates for Shares, which the Company agrees to sell, to be made available to the Agent at the Company's address at least one full business day prior to the relevant Closing Date for checking and packaging.*

C. A Closing Date, as referred to in this Agreement, shall be the date or dates mutually agreed upon within three (3) regular full business days after written notice by the Agent to the Company, on which the Agent or the Escrow Agent, in the case of the Closing Date, shall make payment for and the Company shall deliver certificates for the Shares, in accordance with this Article VI. (Emphasis added)

Media's actions were more than ministerial. Pursuant to the contract, the agent had the duty not only to notify the company's escrow agent of the names under which shares were to be registered and in what denominations, but the certificates for these shares were to be made available to the agent at the company's Arizona address at least one full business day prior to the closing date for checking and packaging. Pursuant to the agreement, the date on which the sale of the securities occurred is the closing date of the escrow. The closing occurred in Arizona.

Media and *Amici Curiae* assert that their position is supported by analogous provisions of the Uniform Securities Act of 1956. We disagree. Section 414 of the Uniform Act, which specifies its scope, is not analogous to A.R.S. § 44–1841, which covers the scope of the Arizona Act. Arizona Revised Statutes § 44–1841(A) states only: "It is unlawful to sell or offer for sale within or from this state unless such securities have been registered ..." In contrast, § 414, which sets forth the Uniform Act's scope, consists of 6 paragraphs, four of which read as follows:

(c) For the purpose of this section, an offer to sell or to buy is made in this state, whether or not either party is then present in this state, when the offer (1) originated from this state or (2) is directed by the offeror to this state and received at the place to which it is directed (or at any post office in this state in the case of a mailed offer).

(d) For the purpose of this section, an offer to buy or to sell is accepted in this state when acceptance (1) is communicated to the offeror in this state and (2) has not previously been communicated to the offeror, orally or in writing, outside this state; and acceptance is communicated to the offeror in this state, whether or not either party is then present in this state, when the offeree directs it to the offeror in this state reasonably believing the offeror to be in this state and it is received at the place to which it is directed (or at any post office in this state in the case of a mailed acceptance).

(e) An offer to sell or to buy is not made in this state when (1) the publisher circulates or there is circulated on his behalf in this state any bona fide newspaper or other publication of general, regular, and paid circulation which is not published in this state, or which is published in this state but has had more than

two-thirds of its circulation outside this state during the past twelve months, or (2) a radio or television program originating outside this state is received in this state.

(f) Sections 102 and 210(c), as well as section 405 so far as investment advisers are concerned, apply when any act instrumental in effecting prohibited conduct is done in this state, whether or not either party is then present in this state.

Arizona Revised Statutes § 44-1841(A) leaves the interpretation of the term "from the state" to the courts. In contrast, § 414 defines and delimits the application of the Uniform Act in interstate transactions with only some of their elements in the state. 12 J. Long, *Blue Sky Law.* App. D-61.

The *Amici* brief quotes from 12 J. Long, *Blue Sky Law* § 3.02[3] as follows:

> ... the mere maintenance of a principal place of business or any place of business within the state is not sufficient to trigger the local version of the Uniform Act. (Emphasis added)

Factually this case has considerably more connections within Arizona than the mere maintenance of a principal place of business in this state. In 12 J. Long, *Blue Sky Law*, § 3.01 at 3-4 and 3-5, we read: "Nor is this discussion intended to suggest what necessarily should be the jurisdictional rules in those states which have not adopted § 414 or an equivalent statute." Arizona has not adopted § 414 or an equivalent statute.

We conclude that the offering of the stock and the sales of the stock were "*from*" Arizona.

## II.

The other issue on appeal is:

Did the trial court err in concluding that A.R.S. § 44-1841, as applied in this case, did not violate the Commerce Clause of the United States Constitution?

The Commerce Clause (Article I, Section 8, Clause 3 of the United States Constitution) regulates commerce occurring "among the several states." The Commerce Clause provided Congress with the power to enact laws protecting and encouraging commerce among the states, and the power to "by its own force created an area of trade free from interference by the states ... [that] even without implementing legislation by Congress [serves as a] limitation upon the power of the state." *Great Atlantic and Pacific Tea Co. v. Cottrell,* 424 U.S. 366, 370-371, 96 S.Ct. 923, 927-28, 47 L.Ed.2d 55, 60 (1976), *quoting Freeman v. Hewit,* 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265, 271-272 (1946).

■ As interpreted by the United States Supreme Court, the Commerce Clause invalidates any state statute which *directly* burdens interstate commerce. *Edgar v. Mite Corp.,* 457 U.S. 624, 640, 102 S.Ct. 2629, 2639-40, 73 L.Ed.2d 269, 282 (1982); *Shafer v. Farmer's Grain Co.,* 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925). Moreover, any state statute which *incidentally* affects commerce will be struck down under the Commerce Clause if the burden imposed upon commerce is clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178 (1970); *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 815-16, 4 L.Ed.2d 852, 856 (1960).

We hold that the application of the statutes to the facts of this case constitutes an improper interference with interstate commerce.

*Edgar* involved an Illinois statute regulating takeover offers. The statute required the shares of a target company to be registered with the Illinois Secretary of State. A target company is defined as a corporation or other issuer of securities in which Illinois shareholders own 10% of the class of equity securities subject to the takeover offer or when any two of the following conditions are met: the corporation has its principal executive offices in Illinois, is organized under the laws of Illinois, or has at least 10% of its stated capital and paid-in surplus represented within the state. Mite Corp. was incorporated under the laws of Delaware, with its principal executive offices in Connecticut. Mite

initiated a tender offer for all outstanding shares of Chicago Rivet & Machine Co., a publicly held Illinois corporation, without complying with the Illinois statute. The State of Illinois sought to prevent Mite from proceeding with its tender offer to not only the shareholders living in Illinois, but also to those living in other states.

The Court stated:

The Commerce Clause provides that "Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const., Art. I, § 8, cl. 3. "[A]t least since *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852), it has been clear that 'the Commerce Clause.... even without implementing legislation by Congress is a limitation upon the power of the States.'" Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. The Commerce Clause, however, permits only *incidental* regulation of interstate commerce by the States; *direct regulation is prohibited.*

. . . .

States have traditionally regulated intrastate securities transactions, and this Court has upheld the authority of States to enact "blue-sky" laws against Commerce Clause challenges on several occasions. The Court's rationale for upholding blue-sky laws was that they only regulated transactions occurring within the regulating States. "The provisions of the law ... apply to dispositions of securities *within* the State and while information of those issued in other States and foreign countries is required to be filed ..., they are only affected by the requirement of a license of one who deals with them *within* the State.... Such regulations affect interstate commerce in [securities] only incidentally. *Hall v. Geiger–Jones Co., supra,* 242 U.S. [539]

at 557–558, 37 S.Ct. [217] at 223 [61 L.Ed. 480, 492]. (Citations omitted)

. . . .

*While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders. Insofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law.* (Emphasis added)

*Edgar,* 457 U.S. at 640–44, 102 S.Ct. at 2639–41, 73 L.Ed.2d at 282–284.

Subsequently, in *CTS Corporation v. Dynamics Corporation of America, et al.,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), the United States Supreme Court upheld an Indiana Act which regulated tender offers made to shareholders of corporations incorporated in Indiana. The Court stated:

No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders. See restatement (Second) of Conflict of Laws § 304 (1971) (concluding that the law of the incorporating State generally should "determine the right of a shareholder to participate in the administration of the affairs of the corporation"). Accordingly, we conclude that the Indian Act does not create an impermissible risk of inconsistent regulation by different States.

. . . .

It thus is an accepted part of the *business landscape in this country for States to create corporations,* to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved *in the corporations it charters,* as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.

There can be no doubt that the Act reflects these concerns. *The primary purpose of the Act is to protect the shareholders of Indiana corporations.*

. . . .

*We agree that Indiana has no interest in protecting nonresident shareholders of nonresident corporations.* (Emphasis added)

*CTS Corporation,* 481 U.S. at 78–93, 107 S.Ct. at 1644–51, 95 L.Ed.2d at 85–87.

In this case, Media was not incorporated in Arizona. All of the stock purchasers are nonresidents.

■ Under the facts of this case, Arizona had no duty to the purchasers whose home states had already determined that the offerings met their own state's standards and had registered the offerings in those states and with the Securities and Exchange Commission. To hold otherwise would allow the Commission to have an effective veto over offerings and sales approved by the Securities and Exchange Commission and securities officials from other states, even though no purchases were made by Arizona residents. The business reputation of the State of Arizona is not at stake under the facts of this case.

We conclude that the Act, as applied in this case, constitutes a direct burden upon interstate commerce. Even if we assume that the burden imposed is incidental, rather than direct in order to satisfy constitutional scrutiny, the burden may not be excessive in relation to the local interests sought to be served. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

The state asserts that if a statute as applied to this case creates a burden on interstate commerce, it is only incidental and the burden is not excessive in relation to the local interests sought to be served. The state correctly asserts that Arizona has an important interest in keeping itself free of enterprises which offer questionable investment opportunities.

In 12 J. Long, *Blue Sky Laws* § 3.04[3][a], Mr. Long states: "A state has an interest in seeing that its territory is not used as a base of operations to conduct illegal sales in other states. Thus, the host state has an interest in protecting its reputation as not being a center for illegal or questionable securities activity."

The relevant facts on this issue are:

1. Media was incorporated in the State of Delaware and the prospectus so stated.

2. The underwriter, brokers and dealers involved in the securities offerings and sales were not Arizona residents.

3. No sales were solicited or made to Arizona residents.

4. The purchase contracts were not made in Arizona.

5. The offer and sale of the securities were properly registered with the federal Securities and Exchange Commission and in the states where the purchasers resided.

6. Media's Supplemental Prospectus, dated December 30, 1986, stated:

*The Company has withdrawn its application to sell shares included in this offering to Arizona residents due to objections raised by the Arizona Securities Division* (the "Division"). The Division may still claim that the offering should not be made to non-Arizona residents even though the offering has been declared effective by the Federal Securities and Exchange Commission and by the State Securities Commissioners of 12 other states. The Company disputes any such claim by the Division and would vigorously contest it. However, if such a claim is successfully pursued, the Company could be subject to injunctive and other remedies, including penalties of up to $1,000,000 and possible rescission by purchasers in this offering. This could have a negative impact on the selling effort of the Underwriter and on the ability to complete the offering within the original 90 day period. *In addition, the defense costs in any such litigation would be an additional use of the working capital of the Company.* (Emphasis added)

The prospectus and supplement placed prospective purchasers on notice that Media was a Delaware corporation, that the offerings and sales were not approved by

the Arizona Corporation Commission, and that the Arizona Corporation Commission might file suit asking for injunctive and other remedies. These statements negate the Commission's position that if the sale was unfair, blame could be placed on Arizona, tarnishing its reputation. Any out-of-state buyer who familiarized himself with the prospectus and supplement would be advised that it was his own state, not Arizona, that regarded the offer as appropriate. In this case, the state does not have an overriding regulatory policy need. Under the facts of this case the burden, even if it were only incidental, is excessive.

■ Media has requested attorney fees pursuant to A.R.S. § 12–348 and rule 21(c), Arizona Rules of Civil Appellate Procedure. The state failed to respond to this request. The discretionary provisions of § 12–348 do not apply in this case; therefore, this court has no discretion to deny attorney fees. Media is awarded attorney fees under rule 21(c).

The judgment of the trial court is reversed and the case is remanded to the trial court with directions to enter judgment in favor of Media.

FIDEL, J., concurs.

CORCORAN, Judge, dissenting:

I respectfully dissent from that portion of the opinion that concludes that Arizona's interest in its business reputation is insufficient to justify the incidental burden imposed on interstate commerce by the Arizona Securities Act. I would uphold the trial court's conclusion that "Arizona has a sufficient state interest in the issuance of securities by a company with a base of operations in the state, even though it was incorporated in the State of Delaware so that Arizona's prohibition of the sale of Media Products stock in other states is not an impermissible burden on interstate commerce in contravention to the United States Constitution."

The facts cited by the majority to conclude that the offering and sale of the stock were "from" Arizona within the meaning of A.R.S. § 44–1841 also support the legitimate state interest Arizona has in requiring registration under these facts. Arizona is not only the corporation's principal place of business or "base of operations," but is also the corporation's *only* place of business. Media Products has no headquarters outside of Arizona. It is an "Arizona" enterprise.

Furthermore, all the important aspects of the transaction took place in Arizona: the terms of the sale were formed here; the escrow was set up and closed here; and all the stock was issued from Arizona. The corporation's entire existence centers around Arizona; its formal incorporation in Delaware gives it only the most tenuous and fictional relationship with that state. The impression afforded the corporation's nonresident investors under these circumstances is that they are investing in a *de facto* Arizona corporation. Additionally, *if* litigation results from this securities transaction, the courts of Arizona may be called upon to host the proceedings. Arizona will have redressive jurisdiction; it should also have preventive jurisdiction.

This is not a case where regulation is excessive because the state has no local interest in protecting nonresident investors. *Cf. Edgar v. MITE Corp.*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Here, the state's legitimate local interest is in protecting its business reputation. The state's interest in preventing its territory from being used as a base of operations for unregulated transactions has been widely recognized under federal securities law. *See* 12 J. Long, *Blue Sky Law* § 3.04[3][a] at 3–46 (rev. ed. 1987), and cases cited therein. Professor Long relates circumstances in the 1970s that gave Tennessee a "black eye" in the municipal bond industry, gave Oklahoma and Texas a bad name in the oil and gas lease market, and allowed Utah to become known as a "cesspool of securities fraud." *Id.* Professor Long concludes that "the host state has an interest in protecting its reputation as not being a center for illegal or questionable securities activity." *Id.*

Under the specific facts of this case, I would hold that Arizona had a sufficient

interest in its business reputation among the nonresident purchasers of Media Products stock to justify its regulation of the offering and sale of that stock under the Securities Act. I would affirm on that basis.