CHRYSLER CAPITAL CORPORATION, Cilcorp Lease Management Inc., MWR Capital, Inc., Northern Leasing Company, Inc., and U S West Financial Services, Inc., Plaintiffs,

v.

CENTURY POWER CORPORATION, Tucson Electric Power Company, Catalyst Energy Corporation, and San Diego Gas & Electric Company, Defendants.

No. 91 Civ. 1937 (RPP).

United States District Court,
S.D. New York.

Sept. 4, 1992.

Cravath, Swaine & Moore by Alan J. Hruska, New York City, for plaintiffs.

Skadden, Arps, Slate, Meagher & Flom by Barry H. Garfinkel, New York City, for defendant San Diego Gas & Elec. Co.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is an action for damages and injunctive relief alleging various state law claims sounding in fraud and breach of contract. Defendant San Diego Gas & Electric Company ("San Diego") moves pursuant to Lo-

cal Civil Rule 3(j) for reargument of the Court's Opinion and Order filed on June 24, 1992. *Chrysler Capital Corp. v. Century Power Corp.*, No. 91 Civ.1937, 1992 WL 163006, 1992 U.S.Dist. LEXIS 9187 (S.D.N.Y. June 24, 1992) ("the June 24 Opinion"). For the reasons set forth below, the motion for reargument is granted, and, upon reconsideration, the Court adheres to the June 24 Opinion.

## BACKGROUND

This action arises from a December 31, 1986 transaction involving the sale and leaseback of an electric generating plant and certain other utility facilities. The facts underlying that transaction, the events leading to this lawsuit, and the procedural history of this matter are set forth in detail in the June 24 Opinion and in the Court's other opinions in this action, familiarity with which is presumed. *See Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260 (S.D.N.Y.1991); *Philip Morris Capital Corp. v. Century Power Corp.*, No. 91 Civ.1937, 1992 WL 88133, 1992 U.S.Dist. LEXIS 5601 (S.D.N.Y. Apr. 23, 1992).

The June 24 Opinion addressed San Diego's motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' claims alleging violations of the blue-sky laws of Arizona, Connecticut, Iowa, and Oregon. With regard to Plaintiffs' claim under Arizona law, the Court relied on *Arizona Corp. Comm'n v. Media Products, Inc.*, 158 Ariz. 463, 465, 763 P.2d 527, 529 (Ct.App.1988), and ruled that Plaintiffs stated a claim for violation of Ariz.Rev.Stat. ("A.R.S.") § 44–1991. San Diego now moves for reargument of this ruling.

## DISCUSSION

■ To be entitled to reargument under Rule 3(j), the party seeking reargument "must demonstrate that the court overlooked controlling decisions or factual matters that were put before the court on the underlying motion." *Novak v. Nat'l Broadcasting Co., Inc.*, 760 F.Supp. 47, 48 (S.D.N.Y.1991). The purpose of the rule is

"to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y.1988). Accordingly, the party seeking reargument "is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use Rule 3(j) to advance new facts and theories in response to the court's rulings." *McMahan & Co. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 727 F.Supp. 833, 833 (S.D.N.Y.1989).

In seeking reargument of this motion, San Diego does not point to any controlling decisions or factual matters which this Court *overlooked* in the June 24 Opinion. Rather, San Diego contends that the Court misinterpreted *Media Products*, and it provides new precedent and argument in support of its position. San Diego does, however, press its argument that application of the Arizona statute would constitute a violation of the Commerce Clause, an argument which the Court did not address in the June 24 Opinion. Accordingly, the Court proceeds to address San Diego's contentions.

## I. THE JUNE 24 OPINION

■ The anti-fraud provision of the Arizona blue-sky law provides:

It is fraudulent practice and unlawful for a person, in connection with a transaction or transactions *within or from this state*, involving an offer to sell or buy securities, or a sale or a purchase of securities ... directly or indirectly to do any of the following:

1. Employ any device, scheme or artifice to defraud.

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

A.R.S. § 44–1991 (emphasis added). In the June 24 Opinion, the Court ruled that the sale of securities by Century Power Corporation ("Century")[1] was "from" Arizona within the meaning of § 44–1991.

In so ruling, the Court relied upon *Media Products*, wherein identical language in the registration provision of the Arizona blue-sky law, A.R.S. § 44–1841,[2] was interpreted to apply to a sale of securities by a foreign corporation whose base of operations was in Arizona. In *Media Products*, the court determined that the securities were offered or sold "from" Arizona, even though:

> (i) all of the sales activities were conducted by out-of-state broker-dealers in states other than Arizona, (ii) the offers to purchase were made and accepted out-of-state, and (iii) no sale or offer of sale was made to any resident of Arizona.

*Media Products*, 158 Ariz. at 465, 763 P.2d at 529. The *Media Products* court based its ruling on the trial court's finding that the corporation had performed "more than ministerial" actions from its base of operations in Arizona. *Id.* at 465, 763 P.2d at 529.

This Court found that the transaction was also "from" Arizona, reasoning, "Where the issuer of the securities is incorporated in and has its principal place of business in Arizona, the securities must have been offered or sold 'from' Arizona." *Chrysler Capital*, 1992 WL 163006, at *3, 1992 U.S.Dist. LEXIS 9187, at *8. Accordingly, the Court rejected San Diego's argument that the transaction did not fall within the purview of the Arizona statute.

San Diego argues that the Court's ruling was erroneous, advancing two arguments in support of its position. First, San Diego maintains that a security is not offered or sold "from" Arizona within the meaning of § 44–1991 merely because the issuing corporation is organized under Arizona law and has its principal place of business in Arizona. In so arguing, San Diego relies on (i) *Media Products* and (ii) a legal opinion from the Arizona Attorney General to the Securities Division of the Arizona Corporation Commission. Ariz.Att'y Gen.Op. No. 56–140 (Aug. 24, 1956) ("Opinion 56–140"). Second, San Diego argues that application of § 44–1991 to this transaction would constitute an unconstitutional interference with interstate commerce.

## II. APPLICABILITY OF § 44–1991

Upon examination of § 44–1991, Opinion 56–140, and *Media Products*, the Court adheres to its ruling that the transaction at issue here was "from" Arizona.

### A. *Statutory Language*

"[I]n determining the scope of a statute, one is to look first at its language." *North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983).

By its terms, § 44–1991 applies only to transactions "within or from" Arizona. Only a transaction which occurs entirely inside the state can be said to occur "within" Arizona. Therefore, the words "from this state" must apply to transactions which do not occur entirely inside Arizona. If the drafters of § 44–1991 did not contemplate application of the statute to transactions which occur outside the state, then inclusion of "from this state" would have been nonsensical. Accordingly, the language of § 44–1991 indicates that its drafters contemplated application to transactions, such as the one at issue, which occur at least in part outside of Arizona.

### B. *Attorney General's Opinion 56–140*

In Opinion 56–140, the Arizona Attorney General responded to the question:

> or registered by qualification under §§ 44–1891 through 44–1900, except securities exempt under §§ 44–1843 or 44–1843.01 or securities sold in exempt transactions under § 44–1844.
>
> B. A person violating this section is guilty of a class 4 felony.

---

**1.** Century was formerly known as "Alamito Power Company."

**2.** A.R.S. § 44–1841 provides:
> A. It is unlawful to sell or offer for sale within or from this state any securities unless such securities have been registered by description under §§ 44–1871 through 44–1875

Do the words "within or from this state" contained in A.R.S. 44–1841,[3] mean that a corporation must register an issue of its stock that is to be offered and sold outside of the State of Arizona merely because it is an Arizona corporation, even though it has no assets within this state, no officers, office or connection with the State of Arizona other than having a statutory agent?

The Attorney General answered the question in the negative, reasoning that application of the statute in such circumstances would not serve the interest contemplated by the legislature in including in the statute the words "from this state."

The Attorney General found that the words "from this state" were included in the statute "to prevent the setting up of a base of operations within this state and the selling and offering for sale of securities to people outside the State of Arizona *from* within this state." This finding was based on *Stevens v. Wrigley Pharmaceutical Co.*, 9 N.J.Misc. 385, 154 A. 403 (Ch.1931), wherein the court held that an identically worded New Jersey provision was intended "to prevent this state from being used as a base of operations for crooks marauding outside the state."

The Attorney General reasoned that a corporation whose sole contact with Arizona was having a statutory agent in Arizona to maintain its status as an Arizona corporation had no "base of operations" within Arizona from which it might "maraud." Therefore, securities issued by such a corporation could not affect the interest protected by the "from this state" language of § 44–1841. Accordingly, Opinion 56–140 concluded that the drafters of the section could not have intended that the Arizona blue-sky law required registration in Arizona of securities offered by a corporation whose sole contact with Arizona was its organization and status maintenance under Arizona law.

San Diego interprets Opinion 56–140 to mean that a securities offering is not "from" Arizona merely because the issuer,

like Century, happens to be an Arizona corporation. However, Opinion 56–140 can also be interpreted to stand for the proposition that where a corporation has a base of operations in Arizona, then the state has an interest to protect when the corporation issues securities: namely, preventing Arizona from being used as a base of operations for crooks marauding outside the state.

Plaintiffs allege that Century is an Arizona corporation with its principal place of business in Tucson, Arizona. Amended Complaint ¶ 5. San Diego does not contend that a corporation's principal place of business is not its "base of operations." Indeed, such an argument would not befit an electric utility whose generating facilities are also located in the state of its principal place of business. Accordingly, nothing in Opinion 56–140 leads to the conclusion that Century's securities were not offered or sold "from" Arizona, and Opinion 56–140 does not adequately support San Diego's position that Century's securities do not fall within the ambit of § 44–1991.

### C. *Media Products*

As noted above, the issue before the *Media Products* court was whether the sale or offering for sale of securities by a foreign corporation with a base of operations in Arizona was a transaction "from" Arizona. The *Media Products* court concluded that the sale was "from" Arizona even though: (i) all of the sales activities were conducted by out-of-state broker-dealers in states other than Arizona, (ii) the offers to purchase were made and accepted out-of-state, and (iii) no sale or offer of sale was made to any resident of Arizona. *Media Products*, 158 Ariz. at 465, 763 P.2d at 529.

The court's ruling was based upon the trial court's finding that the issuing corporation performed the following actions in Arizona which were "more than ministerial":

---

**3.** The parties appear to agree that "within or from this state" as used in § 44–1841 has the same meaning as the phrase as used in § 44–1991.

(1) the issuer's principal place of business and base of operations was Arizona;

(2) the officers and directors operated from and resided in Arizona;

(3) the "Selling Agency Agreement" provided that notices pursuant to that agreement were to be delivered to the company in Arizona;

(4) the Board of Directors meetings took place in Arizona;

(5) an Arizona bank was designated escrow agent;

(6) the company delivered the stock certificates to the escrow agent against payment at a closing in Arizona; and

(7) the stock certificates were prepared and issued by a transfer agent in Arizona.

*Media Products,* 158 Ariz. at 465–66, 763 P.2d at 529–30. San Diego argues that because only the first of these seven factors is satisfied in the instant transaction, Century did not issue the securities in question "from" Arizona.[4]

The seven factors enumerated in *Media Products* do not, however, constitute a catalogue of conditions necessary for finding that a transaction is "from" Arizona. Rather, the seven listed items merely illustrate that Media Products had substantial contacts with Arizona. While San Diego has shown that the closing of the transaction at issue took place outside of Arizona, it has not shown that "more than ministerial actions" did not take place in Arizona.

In determining whether this action was "from" Arizona, the Court is mindful that it rules on a motion pursuant to Rule 12(b)(6). It is well settled that a complaint "should not be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). "[F]actual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the Plaintiff." *Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir.1988).

Here, Plaintiffs allege that Century is an Arizona corporation with its principal place of business in Arizona. Amended Complaint ¶ 5. Because Century's principal place of business is in Tucson, Arizona, it can be inferred that Century's officers and directors operated from Arizona, that many of them resided in Arizona, and that director's meetings were held in Arizona. Plaintiffs also allege that the physical assets covered by the securities at issue are located in Apache County, Arizona. Amended Complaint, ¶ 9. Furthermore, the Participation Agreement governing this transaction, which is referred to in the Amended Complaint, requires that all notices relating to the sale and leaseback be sent to Century at its Arizona headquarters. *See* Amended Complaint ¶ 15.

San Diego notes, however, that Plaintiffs have previously argued that the instant transaction was negotiated and closed in New York, and that the securities were issued and paid for in New York. Def.Br. at 6. San Diego argues that the transaction's New York connections reveal that the securities were not issued "from" Arizona. In so arguing, however, San Diego ignores the central holding of *Media Products:* that a sale of securities which occurs entirely outside of Arizona may be a transaction "from" Arizona, provided the issuer, a foreign corporation, has performed actions within the state in connection with the transaction.[5] *Media Products,* 158 Ariz. at 465, 763 P.2d at 529.

Accordingly, at this stage of the litigation, Plaintiffs have made a showing sufficient to withstand a motion to dismiss that Century performed "more than ministerial" actions in Arizona at the time it issued the relevant securities. Defendants have not shown that Century's securities were not

---

**4.** The question of whether the transaction between Plaintiffs and Century involved "securities" is apparently an issue to be litigated in this action.

**5.** The court went on to hold that for Arizona to require blue-sky registration of such securities would be an unconstitutional burden on interstate commerce. *Media Products,* 158 Ariz. at 469–70, 763 P.2d at 533–34.

issued "from" Arizona within the meaning of § 44–1991. If, after further discovery, San Diego can show that Century did not perform significant actions in Arizona in connection with this transaction, then San Diego will be entitled to summary judgment on this claim.

### III. CONSTITUTIONALITY OF § 44–1991 AS APPLIED

█ In *Media Products*, after finding that the transaction at issue was "from" Arizona, the court determined that enforcement of the registration provision of Arizona's blue-sky law, § 44–1841, would constitute an improper interference with interstate commerce. *Media Products*, 158 Ariz. at 469–70, 763 P.2d at 533–34. San Diego now argues that application of § 44–1991 to the instant transaction would similarly offend the Commerce Clause.

The Supreme Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the Court has generally struck down the statute without further inquiry. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579–80, 106 S.Ct. 2080, 2084–85, 90 L.Ed.2d 552 (1986). When, however, a statute has only indirect effects on interstate commerce and regulates even-handedly, the Court has examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Id.* at 579, 106 S.Ct. at 2084 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

The Supreme Court has also recognized, however, that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. "In either situation, the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.* As one commentator has noted:

> The distinction between "direct" and "indirect" burdens has been rejected as overly conclusory and misleadingly precise. In its place, the Court has substituted the following, more openly indeterminate, principle: State regulation affecting interstate commerce will be upheld if (a) the regulation is rationally related to a legitimate state end, and (b) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation.

Laurence H. Tribe, *American Constitutional Law* 408 (1988).

San Diego does not contend that Arizona's interest in preventing securities fraud is not a legitimate state end. Rather, it maintains that application of the § 44–1991 to this transaction would impose a burden on interstate commerce which outweighs any local benefits. San Diego fails, however, to show how interstate commerce will be burdened by application of the statute.

San Diego fails to cite any case in which a remedial anti-fraud statute was found to burden interstate commerce. Rather, the cases upon which San Diego relies all concern Commerce Clause challenges to state statutes of a regulatory nature which tended to burden otherwise lawful interstate transactions. For example, *Media Products* addressed a challenge to application of Arizona's blue-sky registration provision which, as noted above, required corporations issuing securities "within or from" Arizona to register the securities prior to the offer or sale of the securities. *Media Products*, 158 Ariz. at 469–70, 763 P.2d at 533–34. The provision thus imposed an additional burden on corporations wishing to participate in interstate transactions of securities, thereby tending to inhibit putatively lawful interstate commerce.

San Diego also relies on *State ex rel. Corbin v. Goodrich*, 151 Ariz. 118, 726 P.2d 215 (Ct.App.1986), wherein the court expressed agreement with the principle that "if the statute sought to regulate the

sale of securities outside Arizona, it would conflict with the commerce clause and would be unconstitutional." *Id.* at 122, 726 P.2d at 219 (citing *Polaris Int'l Metals Corp. v. Arizona Corp. Comm'n,* 133 Ariz. 500, 505, 652 P.2d 1023, 1028 (1982)). However, the statute at issue in *Goodrich,* and in *Polaris,* was the same inherently burdensome registration provision at issue in *Media Products:* § 44–1841.

Lastly, San Diego relies on *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), wherein the Supreme Court invalidated an Illinois anti-takeover law which also, by its very nature, burdened interstate transactions. The Illinois law required the registration of certain tender offers with the Illinois Secretary of State; empowered the Secretary to hold hearings to adjudicate the substantive fairness of registered tender offers; and authorized the Secretary to deny registration, and thus prevent interstate transactions, where a tender offer: would not "provide full and fair disclosure to the offerees," was "inequitable," or "would work or tend to work a fraud or deceit upon the offerees." *Id.* at 627, 102 S.Ct. at 2633. Thus, in the same vein as the Arizona registration provision, the Illinois law imposed additional burdens on otherwise lawful interstate transactions of securities.

Unlike the provisions at issue in *Media Products, Goodrich,* and *Edgar,* the Arizona anti-fraud statute is not preventative, but remedial in nature. Section 44–1991 imposes no additional requirements on persons engaged in interstate commerce, nor does it impede *any* interstate transactions. Rather, like any tort recovery statute, it merely provides a post-hoc remedy for persons aggrieved by allegedly unlawful conduct. Thus, in no sense does it prevent or burden interstate commerce. As Plaintiffs note:

> A statute proscribing fraud is not discriminatory; it does not prevent or delay commercial transactions; it merely creates liability for behavior deemed undesirable everywhere. If anything, such legislation *facilitates* commerce far more than it can even be argued to "burden" in any sense ... because it provides a

measure of assurance that commerce will be honestly transacted.

Pl.Supp.Mem. at 10.

Accordingly, because San Diego has failed to show that application of § 44–1991 to the instant transaction imposes a burden on interstate commerce which outweighs the state interest in providing remedies for fraudulent securities transactions, such application does not offend the Commerce Clause.

## CONCLUSION

For the reasons stated above, the Court adheres to its June 24 Opinion denying San Diego's motion to dismiss Plaintiffs' claim under § 44–1991. All counsel are ordered to appear in courtroom 302 for a pre-trial conference on September 15, 1992 at 9:00 a.m. Counsel for San Diego is ordered to notify counsel for the other Defendants of this conference.

IT IS SO ORDERED.