

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-7-1999

# AS Goldmen & Co Inc v. NJ Bureau Securities

Precedential or Non-Precedential:

Docket 97-5618

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"AS Goldmen & Co Inc v. NJ Bureau Securities" (1999). *1999 Decisions*. Paper 4.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/4

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 7, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5618

A.S. GOLDMEN & COMPANY, INC.

v.

NEW JERSEY BUREAU OF SECURITIES,
        Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 96-cv-05280)
District Judge: Honorable Dickinson R. Debevoise

Argued Thursday, May 21, 1998

BEFORE: ROTH1, McKEE and GARTH, Circuit Judges

Reargued Friday, December 4, 1998

BEFORE: ALITO, McKEE and GARTH, Circuit Judges

(Opinion filed January 7, 1999)

_____

1. Judge Roth was obliged to recuse herself after argument but before
clearance of this Opinion. Judge Alito took Judge Roth's place upon
reconstitution of the panel and reargument.

Peter Verniero, Attorney General
Office of the Attorney General of
 New Jersey
Andrea M. Silkowitz, Assistant
Attorney General
Division of Law
Hughes Justice Complex
CN-112
Trenton, New Jersey 08625

Gail M. Cookson (argued)
Deputy Attorney General
Tracy Thayer
Deputy Attorney General
Office of the Attorney General of
 New Jersey
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101

Attorneys for Appellant
New Jersey Bureau of Securities

Martin Flumenbaum (argued)
Brad S. Karp
Paul, Weiss, Rifkind, Wharton &
 Garrison
1285 Avenue of the Americas
New York, New York 10019-6064

Michael A. Lampert
Saul, Ewing, Remick & Saul
214 Carnegie Center, Suite 202
Princeton, New Jersey 08540

Attorneys for Appellee
A.S. Goldmen & Company, Inc.

Karen M. O'Brien, General Counsel
North American Securities
Administrators Association, Inc.
10 G Street, NE
Suite 710
Washington, D.C. 20002

Attorneys for Amicus-Appellant
North American Securities
Administrators Association, Inc.

Richard E. Walker
Eric Summergrad
Luise de la Torre
Paul Gonson
Securities & Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549

Attorneys for Amicus-Appellant
Securities & Exchange Commission

OPINION OF THE COURT

GARTH, Circuit Judge:

This case raises a dormant commerce clause challenge to one aspect of the New Jersey Uniform Securities Law. The appellee, A.S. Goldmen & Co., Inc. ("Goldmen"), claims that N.J.S.A. S 49:3-60 ("S 60") violates the dormant commerce clause insofar as it authorizes the appellant New Jersey Bureau of Securities to prevent Goldmen from selling securities from New Jersey to buyers in other states where purchase of the securities was authorized by state

regulators. The district court agreed, and granted summary judgment in favor of Goldmen. We hold that S 60 does not run afoul of the dormant commerce clause, and therefore reverse.

I.

A.

Because of the noted potential for fraud and deception in the buying and selling of securities, securities markets are among the most heavily regulated markets in the United States.2 Regulation of securities first flourished at the state level in the 1910s, when states began enacting laws that required the registration of a securities offering before the sale of the security was permitted. The purpose of these so-called "blue sky" laws was to allow state authorities to prevent unknowing buyers from being defrauded into buying securities that appeared valuable but in fact were worthless.3 By 1933, all but one state had passed blue sky laws; today, all fifty states, the District of Columbia, Guam, and Puerto Rico have blue sky laws in force. See Louis Loss & Joel Seligman, 1 Securities Regulation 40-41 (3d ed. Rev. 1998) (hereinafter, "Loss & Seligman").

Aggressive federal regulation of securities markets began in the early 1930s with the passage of the Securities Act of 1933 and the Securities Exchange Act of 1934. Today, the Securities and Exchange Commission ("SEC") administers these and five other federal statutes, which altogether form a complex web of federal regulations. See id. at 224-81. Despite this complex federal scheme, Congress, the courts, and the SEC have made explicit that federal regulation was not designed to displace state blue sky laws that regulate interstate securities transactions. See, e.g., 15 U.S.C. S 77r(c) (1997) (preserving state jurisdiction "to investigate and bring enforcement actions with respect to . . . unlawful conduct by a broker or dealer") (National Securities Markets Improvement Act of 1996); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 137 (1973) ("Congress

_____

2. Securities are the collective term used to describe documents that represent ownership in a company or a debt. Common examples include stocks, bonds, notes, convertible debentures, and warrants. See Black's Law Dictionary 1215 (5th ed. 1979); Joseph C. Long, 12 Blue Sky Law S 2.01 (1997).

3. See generally Jonathan R. Macey & Geoffrey P. Miller, Origin of the Blue Sky Laws, 70 Tex. L. Rev. 347 (1991).

intended to subject [securities] exchanges to state regulation that is not inconsistent with the federal [laws]."); Loss & Seligman at 275-281. Although the enactment of the National Securities Markets Improvement Act of 1996 narrowed the role of state blue sky laws by expanding the range of federal preemption, federal and state regulations each continue to play a vital role in eliminating securities fraud and abuse. See Loss & Seligman at 60-62; Manning G. Warren III, Reflections on Dual Regulation of Securities Regulation: A Case Against Preemption, 25 B.C. L. Rev. 495, 497, 501-27 (1984) (describing how Congress, the courts, and the SEC have expressly authorized the enforcement of state blue sky laws).

B.

Among blue sky laws, the most common regulatory approach is the mixed disclosure and merit regulation scheme offered by the Uniform Securities Act ("Uniform Act").4 Drafted in large part by the late Professor Louis Loss, the Uniform Act has been adopted with some modification in nearly forty states, including New Jersey. See N.J.S.A. S 49:3-47 to 76. The Act contains three essential parts: provisions requiring the registrations of securities sold within the state; provisions requiring the registration of persons involved in the securities industry; and various antifraud provisions. See id; see also Joseph C. Long, 12 Blue Sky Law S 1.07 (1997) (hereinafter, "Long").

This case raises a constitutional challenge to N.J.S.A. S 49:3-60 ("S 60"), which is New Jersey's codification of the portion of the Uniform Act that makes it "unlawful for any security to be offered or sold in this State" unless the security is either registered by state authorities, is exempt

_____

4. The various state and federal securities regulations reflect two broad regulatory philosophies: merit regulation and disclosure. Regulations based on disclosure principles, such as the federal Securities Act of 1933, seek to provide investors with all material and relevant information about the securities and the company offering them. In contrast, merit regulations seek to protect investors by prohibiting transactions that authorities deem unfair or unjust. See Joseph C. Long, 12 Blue Sky Law S 1.05 (1997).

5

under N.J.S.A. S 49:3-50, or is a federally covered security.5 When read in conjunction with N.J.S.A. S 49:3-51(c), which states that "an offer to sell or buy is made in this State . . . when the offer . . . originates in this State," S 60 grants New Jersey regulatory authorities the power to regulate the offer or sale of all non-exempt, non-covered securities whenever the offer is made within the state of New Jersey. Under N.J.S.A. S 49:3-64 and the 1985 amendments to the New Jersey statute, this authority permits the chief of the New Jersey Bureau of Securities ("Bureau") to exercise broad powers to regulate sale of such securities in New Jersey when it is deemed in the public interest and various statutory requirements have been met.

II.

A.

A.S. Goldmen & Co. is a securities broker-dealer with its sole office located in Iselin, New Jersey.6 At the time of proceedings before the District Court, Goldmen's sole office was located in New Jersey. Since that time, it has opened at least one other office out of state.

Goldmen specializes in underwriting the public offerings of low priced, over-the-counter securities, and then selling those securities in the secondary market. During thefirst several months of 1996, Goldmen planned the initial public

_____

5. In its current form, N.J.S.A. S 49:3-60 (1997) states:

> It is unlawful for any security to be offered or sold in this State unless:
> (a) The security or transaction is exempt under section 3 of P.L.1967, c. 93 (C.49:3-50);
> . . .
> (e) The security is registered under this act; or
> (f) It is a federal covered security for which a notice filing and fees
> have been submitted as required by section 14 of this act (C.49:3-60.1).

6. A "broker-dealer" is defined by the Act as "any person engaged in the business of effecting or attempting to effect transactions in securities for
the accounts of others or for his own account." N.J.S.A. S 49:3-49(c).

6

offering of Imatec, Ltd. ("Imatec"). Imatec is a Delaware corporation, located in New York, that was formed in 1988 to develop, design, market, and license image enhancement technologies. Goldmen planned for the Imatec securities to be traded as a NASDAQ Small Cap stock because such stocks are exempt from initial federal registration requirements, see 15 U.S.C. S 77(d) (1997). The primary regulation of the Imatec security during the first 25 calendar days of the offering would occur at the state level. See 17 C.F.R. S 230.174(d) (1992). Accordingly, in May 1996, Goldmen concurrently filed registration statements with the SEC, and also attempted to register the offering "by qualification" with state regulatory authorities in over a dozen states, including New Jersey.7

The prospectus filed by Goldmen with the New Jersey Bureau of Securities ("the Bureau") listed Goldmen as the sole underwriter, and also indicated that Goldmen would own the shares to be offered to the public. Reviewing Goldmen's application, the Bureau expressed various concerns regarding the Imatec offering to Goldmen's counsel. Although the Bureau was not prepared to make allegations of fraud, it had already been investigating Goldmen's business practices at that time, and was concerned that the combination of Goldmen's practices and the bleak financial prospects of Imatec made the offering a high-risk investment that was likely to be associated with abusive and manipulative sales practices.

On August 7, 1996, the Bureau informed Goldmen's counsel that it was considering the issuance of a stop order that would block the Imatec offering from being registered in New Jersey. Goldmen's counsel and the Bureau then entered into negotiations concerning the future of the Imatec offering. On October 23, 1996, these negotiations

_____

7. Registration "by qualification" is the most comprehensive form of blue sky registration, and is generally necessary when the security is exempt from initial federal registration requirements. The other types of registration, registration "by notification" and registration "by coordination," are much simpler and are reserved for securities that carry a higher indicia of reliability than securities that must be registered by qualification. See N.J.S.A.S 49:3-61 (describing requirements for registration by qualification).

resulted in a Consent Order signed by the CEO of Imatec and the Bureau chief. According to the Consent Order, Goldmen withdrew its application to register the Imatec offering in New Jersey, and agreed that the Imatec offering did not qualify for N.J.S.A. S 49:3-50(b) exemptions to the registration rule of S 60. Goldmen was permitted to make unsolicited sales from New Jersey or to sell to certain financial institutions or to other broker-dealers. However, the Consent Order specifically denied Goldmen exemptions that would have allowed it to solicit members of the public to purchase Imatec stock in the secondary market. App. 38-41; App. 156-57.

Five days after Goldmen entered into the Consent Order, on October 28, 1996, the registration statement that Goldmen had filed with the SEC became effective. [8] As of that date, Goldmen had managed to register the Imatec offering in sixteen states, but had been forced to withdraw its registration in several others, including New Jersey.

On the morning of October 29, 1996, Goldmen commenced the initial public offering from its office in Iselin, New Jersey. By telephone, Goldmen solicited sales to individuals outside of New Jersey, but did not solicit any sales to individuals within New Jersey. By 3 p.m. of that day, Goldmen had sold the entire public offering. [9] Subsequently, Goldmen continued to buy and sell Imatec securities in the interdealer market from its New Jersey office.

_____

8. Registration with the SEC does not imply SEC approval of the offering. See 15 U.S.C. S 77w (1997) ("[T]he fact that the registration statement for
a security has been filed or is in effect . . . shall [not] be deemed a finding by the Commission that the registration statement is true and accurate on its face . . . , or be held to mean that the Commission has in any way passed upon the merits of, or given approval to, such security.")

9. We do not regard this case as moot despite the fact that the Imatec offerings are concluded. We are concerned that this kind of case presents a problem that may be capable of repetition but avoiding review with respect to Goldmen. Weinstein v. Bradford, 423 U.S. 147 (1975). Due to the nature of Goldmen's business, this same problem may be confronted in the future.

The Bureau learned of Goldmen's sales on November 7, 1996. Because the window for state regulation of the Imatec offering closed 25 days after the offering began,[10] the Bureau acted immediately, notifying Goldmen that it believed that the sales violated the Securities Act and the Consent Order. Goldmen took the position that its sales violated neither state law nor the consent order, and informed the Bureau that it intended to continue to buy and sell securities from its New Jersey office. The Bureau responded by issuing a Cease and Desist Order dated November 12, 1996, which ordered Goldmen to "cease and desist from the solicitation of customers, offer and sale of Imatec in or from the State of New Jersey to any members of the public." App. 91.

B.

On the same day that the Bureau issued the Cease and Desist Order, Goldmen filed this declaratory judgment action against the Bureau in federal district court. Goldmen's complaint claimed that "the New Jersey Securities Act, as applied to securities that were not registered or exempt from registration in New Jersey and were sold by brokers located in New Jersey to residents of states (other than New Jersey) in which the securities were qualified for sale, violates the Commerce Clause of the United States Constitution." The complaint also alleged that even if the Securities Act was constitutional, the Act and the Consent Order did not apply to block Goldmen's sales of Imatec securities from New Jersey. According to Goldmen, the sole legal effect of the Act and the Consent Order was to prohibit Goldmen from selling the securities to buyers located in New Jersey.

The district court issued an Order to Show Cause, and held a hearing on November 20, 1996.[11]  The district court

_____

10. Under 15 U.S.C. S 77r(b)(4)(A) and 17 C.F.R. S 230.174(d), the Imatec security became a "covered security" 25 days after the initial public offering. At that time, state regulation was preempted. See 15 U.S.C. S 77r(a)(1)(A) (1997).

11. At the hearing, the Bureau argued that Goldmen's federal action should be stayed under the abstention principles enunciated in Younger

issued a preliminary injunction the same day, enjoining the Bureau from taking any action that would prohibit Goldmen from "soliciting, offering or selling securities that are not registered or exempt from registration in New Jersey to residents of states (other than New Jersey) in which the securities are qualified for sale." App. 402-03.

The case then proceeded to cross-motions for summary judgment. On August 21, 1997, the district court granted Goldmen's motion for summary judgment and denied the Bureau's summary judgment motion. The sole issue addressed was whether the New Jersey Uniform Securities Law violated the dormant commerce clause by authorizing the Bureau to block the sale of securities from New Jersey to buyers in other states where the security was registered. The district court concluded that it did. According to the district court, the law directly regulated interstate commerce because it effectively allowed the Bureau"to impose New Jersey securities regulations onto other states." The district court argued that "[t]o allow the Bureau to preclude consumers in other states from receiving solicitations to purchase securities which their own state regulators have deemed appropriate for purchase is, in essence, to allow the Bureau to substitute its own regulatory judgment for that of other states." Further, the district court argued that absent allegations of fraud, the Bureau had no interest in regulating such transaction. Accordingly, the New Jersey Uniform Securities Law imposed an excessive burden on interstate commerce in relation to New Jersey's local benefits. App. 581 (citing Pike v. Bruce Church, 397 U.S. 137 (1970)).

The Bureau filed a timely appeal.

_____

v. Harris, 401 U.S. 37, 91 S. Ct. 746 (1971). The district court rejected this argument. App. 446. Because the Bureau has chosen not to raise this issue on appeal, we will not address it further. Compare Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 477-80, 97 S.Ct. 1898, 1904 (1977).

10

III.

A. Legal Framework

The Supreme Court has long construed the Commerce
Clause as implying a judicial power to invalidate state laws
that interfere improperly with interstate commerce. See,
e.g., Cooley v. Board of Wardens, 53 U.S. (12 How.) 299
(1851). One consistent strain of these cases authorizes
courts to invalidate state regulations when their
extraterritorial impact is so great that their "practical effect
. . . is to control conduct beyond the boundaries of the
state." Healy v. The Beer Institute, 491 U.S. 324, 336, 109
S.Ct. 2491, 2499 (1989). As Justice Cardozo explained in
Baldwin v. G.A.F. Seelig, 294 U.S. 511, 523, 55 S.Ct. 497,
500 (1935), such a power is necessary to prevent states
from applying "parochial" laws that can bring about "a
speedy end of our national solidarity." "The Constitution,"
Justice Cardozo stated, "was framed upon the theory that
the peoples of the several states must sink or swim
together, and that in the long run prosperity and salvation
are in union and not division." Id.

According to these "extraterritorial effects" cases, a state
may not attempt to regulate commerce that takes place
"wholly outside" of its borders: such a "projection of one
state regulatory regime into the jurisdiction of another
State" is impermissible. Healy, 491 U.S. at 336-37; 109
S. Ct. at 2499. Under this rubric, the Supreme Court has
invalidated state laws that restricted interstate movement of
goods based on the price paid for them in out-of-state
transactions. See, e.g., Baldwin, 294 U.S. at 521, 55 S. Ct.
at 499 (invalidating New York law that banned the
importation of milk into New York when the price paid
outside of New York to the out-of-state producer was lower
than that permitted under then-existing laws regulating
milk purchases from New York producers); Lemke v.
Farmers Grain Co., 258 U.S. 50, 61, 42 S. Ct. 244, 248
(1922) (invalidating North Dakota law requiring exported
wheat to be sold outside of North Dakota at price set by
North Dakota state inspector). Similarly, the Court has
struck down state laws that prohibited the importation of
out-of-state goods unless the importer guaranteed that its

11

in-state prices were no higher than elsewhere. See, e.g., Healy, 491 U.S. at 337, 109 S. Ct. at 2499 (invalidating Connecticut law prohibiting beer imports unless seller guaranteed that prices offered in Connecticut were no higher than in neighboring states); Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579, 106 S. Ct. 2080, 2084 (1986) (invalidating New York law requiring liquor importers to affirm that prices offered to New York wholesalers were lowest nationwide). Finally, the Court has invalidated laws granting officials in one state the authority to block multistate transactions that only marginally involve in-state interests. See Edgar v. MITE Corp., 457 U.S. 624, 643-46, 102 S. Ct. 2629, 2641-42 (1982) (invalidating Illinois law that authorized Illinois officials to block substantively unfair takeovers of multistate companies that had connections to Illinois and also other states).

Of course, these cases do not establish that the states are forbidden categorically to regulate transactions that involve interstate commerce. See H.P. Hood & Sons v. Du Mond, 336 U.S. 525, 532-33, 69 S. Ct. 657, 662 (1949) (Jackson, J.) (recognizing that States have "broad power . . . to protect its inhabitants against . . . fraudulent traders . . . even by use of measures which bear adversely upon interstate commerce"). Rather, states are permitted to regulate in-state components of interstate transactions so long as the regulation furthers legitimate in-state interests. A particularly relevant example of this is Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S. Ct. 217 (1917), and its companion cases, Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559, 37 S.Ct. 224 (1917) and Merrick v. N.W. Halsey & Co., 242 U.S. 568, 37 S.Ct. 227 (1917) (collectively, the "Blue Sky Cases"). In the Blue Sky Cases, the Court considered dormant commerce clause challenges to then-recently enacted Blue Sky laws in Ohio, South Dakota, and Michigan. Although the three statutes differed somewhat, each granted state securities commissions the authority to block the in-state sale or purchase of unlicensed securities. The laws were challenged both by unlicensed in-state securities sellers and the out-of-state purchasers who had traveled in-state to make their purchases, but the Court rejected their claims that the laws

12

violated the dormant commerce clause. The key to the laws' constitutionality, the Court held, was that "[t]he provisions of the law . . . apply to dispositions of securities within the state." Hall, 242 U.S. at 557, 37 S. Ct. at 223 (emphasis in original). By limiting the scope of the statute to dispositions of securities "within the State," the Court announced, the states had merely enacted "police regulation[s]," that "affect[ed] interstate commerce . . . only incidentally." Id. at 558, 37 S. Ct. at 223; see also CTS Corp. v. Dynamics Corp., 481 U.S. 69, 93, 107 S.Ct. 1637, 1651-52 (1987) (rejecting challenge by out-of-state company to Indiana law conditioning acquisition of corporate control of Indiana corporation on approval of a majority of the pre-existing disinterested shareholders, reasoning that law regulated in-state corporations); cf. Shafer v. Farmers' Grain Co, 268 U.S. 189, 200, 45 S. Ct. 481, 485 (1925) (invalidating North Dakota law that regulated in-state handling of wheat headed for interstate commerce that served no legitimate in-state interests).

B. Territoriality

As these cases indicate, the constitutionality of state regulations of interstate commerce depends largely on the territorial scope of the transaction that the state law seeks to regulate. If the transaction to be regulated occurs "wholly outside" the boundaries of the state, the regulation is unconstitutional. MITE Corp, 457 U.S. at 642. If the transaction occurs "within" the boundaries of the state, it is constitutional so long as the regulation furthers legitimate in-state interests. See id. at 643-46; CTS Corp, 481 U.S. at 93.

Therefore, the first issue we must address is the territorial scope of the transaction that New Jersey has attempted to regulate. The question is, what is the territorial basis of a contract entered into by telephone between a New Jersey broker soliciting sales of Imatec securities from New Jersey, and an out-of-state buyer who agrees to purchase them outside of New Jersey? More particularly, can it fairly be said that such a transaction occurs "wholly outside" New Jersey? As this is a legal question, our review is plenary. See Ciarlante v. Brown &

13

Williamson Tobacco Corp., 143 F.3d 139, 145 (3d Cir. 1998).

Goldmen and the Bureau offer divergent views of S 60's territorial scope. Goldmen argues that S 60 permits New Jersey to reach out beyond its borders and block willing buyers from completing transactions authorized by their home states. According to Goldmen, "the effects of the Bureau's application of Section 60 is not to regulate in-state brokers, but to preclude out-of-state residents from purchasing a product deemed appropriate for sale by their own regulators." Br. at 20. Goldmen suggests that the offer's origin in New Jersey is not relevant to the transaction's territoriality, because "the `practical effect' of permitting New Jersey to bar the sale of securities from New Jersey into states where those securities have been qualified for sale is that those out-of-state residents will be precluded altogether from receiving the opportunity to purchase these securities." Id. at 16.

The Bureau's position is that S 60 regulates the offering of securities entirely within the state of New Jersey. According to the Bureau,

> Section 60 simply regulates how brokers located in New Jersey conduct business from their New Jersey offices. In this instance, these were Imatec securities . . . offered for sale by the underwriter through solicitations of the public from New Jersey. The offer and sale arose in New Jersey. Goldmen chose to domicile its highly-regulated business in New Jersey and to conduct that business from within the State.

Br. at 27.12 The Bureau concedes that S 60 may affect interstate commerce, to the extent that sellers such as Goldmen try to sell securities to buyers in other states. However, the Bureau contends that this is merely an indirect effect of what is essentially New Jersey's regulation of New Jersey parties seeking to sell securities in New Jersey.

_____

12. Both amici, North American Securities Aministrators Association and the Securities and Exchange Commission, support the position taken by the New Jersey Bureau of Securities that S 60 does not violate the dormant commerce clause.

14

In resolving this question, we begin by noting that notions of the territorial scope of contracts between citizens of different states have evolved in the past century. At one time, it was fashionable to conceive of contracts between diverse parties as being rooted in a single geographical location, such as the place the offer was accepted. See, e.g., Joseph H. Beale, What Law Governs Validity of a Contract, 23 Harv. L. Rev. 260, 270-71 (1910). Under this traditional approach, it was believed that when a contract offer made in New Jersey was accepted in New York, the contract was "made" in New York, and thus implicated New York's sovereignty. See id; cf. Perrin v. Pearlstein, 314 F.2d 863, 867 (2d Cir. 1963).

The contrasting modern approach is to recognize that contracts formed between citizens in different states implicate the regulatory interests of both states. Thus, when an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract. See, e.g., General Ceramics Inc. v. Fireman's Fund Ins. Co., 66 F.3d 647, 656-59 (3d Cir. 1995) (comparing the regulatory interests of New Jersey and Pennsylvania to a contract formed between a New Jersey company and a Pennsylvania company in the course of determining applicable law). See generally Joseph W. Singer, A Pragmatic Guide to Conflicts, 70 B.U. L. Rev. 731, 785-802 (1990) (describing the regulatory interests of states in contract disputes between diverse parties).

This notion that the sovereignty of both the state of the offeror and offeree are implicated by contracts entered into by citizens in different states is the key to understanding the territorial scope of the contract between Goldmen and the prospective buyers of Imatec in another state such as New York. A contract between Goldmen in New Jersey and a buyer in New York does not occur "wholly outside" New Jersey, just as it does not occur "wholly outside" New York. Rather, elements of the transaction occur in each state,

15

and each state has an interest in regulating the aspect of the transaction that occurs within its boundaries.13

Accordingly, S 60 simply allows the Bureau to regulate its "half" of the transaction-- the offer that occurs entirely within the state of New Jersey-- and thus its territorial scope is indistiguishable from that in Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S. Ct. 217 (1917), Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559, 37 S.Ct. 224 (1917) and Merrick v. N.W. Halsey & Co., 242 U.S. 568, 37 S.Ct. 227 (1917).

Viewed in this light, Goldmen's view that S 60 violates the dormant commerce clause because it projects its ban into jurisdictions that would allow the transaction is logically flawed and simply proves too much. If New Jersey seeks to block Goldmen's offering but the buyer's state (say, New York) would allow it, one state must prevail. One state can in effect "force its judgment" upon the other. Under New Jersey's Blue Sky law, New Jersey can block the transaction even if New York would permit it.

Goldmen's alternative is no better, however: under its view of the dormant commerce clause, New York's approval would permit the transaction, over New Jersey's objection. Thus, the difference between New Jersey's Blue Sky law and Goldmen's proposal is simply the market's default rule: should the transaction be allowed if either state permits, or blocked if either side objects? Such questions of the market's "structure" and its "method of operation" are quite simply beyond the concern of the Commerce Clause, as they "relate to the wisdom of the statute, not to its burden on commerce." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127-28 (1978).

C. Legitimate Interests

Having concluded that S 60 regulates the in-state component of an interstate transaction, we next consider whether the statute reasonably furthers a "legitimate interest" within the boundaries of New Jersey. MITE Corp.,

_____

13. A discussion of New Jersey's interests in this transaction appears in subsection C.

16

457 U.S. at 644, 102 S. Ct. at 2641; CTS Corp., 481 U.S. at 93, 107 S. Ct. at 1651-52.

Goldmen claims that New Jersey has no legitimate interest in regulating Goldmen's non-fraudulent sales to out-of-state residents. If Goldmen's business practices are manipulative, Goldmen argues, the harm will be suffered entirely by out-of-state consumers. Br. at 29. Because the protection of out-of-state consumers from potentially manipulative sales practices is not New Jersey's legitimate concern, Goldmen contends, its regulation of Goldmen's non-fraudulent sales to out-of-state consumers does not implicate any legitimate regulatory interests within the state of New Jersey.

The Bureau responds by arguing that its regulation of in-state sales of securities to out-of-state purchasers furthers important New Jersey interests. We agree. In particular, we consider two legitimate state interests to be particularly strong ones. First, preventing New Jersey companies from offering suspect securities to out-of-state buyers helps preserve the reputation of New Jersey's legitimate securities issuers. States that have failed to monitor out-of-state sales by in-state broker-dealers have suffered in the past, as their legitimate broker-dealers suffered from association with suspect firms offering questionable securities. See Long, S 3.04[3][a] at 3-51 to 3-52 (providing examples); see also Stevens v. Wrigley Pharma. Co., 154 A. 403, 403 (N.J. Ch. Div. 1931) (noting that New Jersey's interest in regulating in-state offers to out-of-state buyers is "not so much to protect the citizens of other states, as to prevent this state from being used as a base of operations for crooks marauding outside the state."); Simms Inv. Co. v. E.F. Hutton & Co., 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("[T]he laws protect legitimate resident issuers by exposing illegitimate resident issuers."). Although this state interest is heightened when the state can prove that the in-state firm has engaged in outright fraud, the interest is nonetheless legitimate when the state seeks to block sales of securities that it believes might be associated with dubious or manipulative sales practices. The difference between a state's (i.e., New Jersey's) interest in preventing fraud and preventing questionable practices is a difference in degree, not a difference in kind.

17

The dissent contends that absent proof of actual fraud, New Jersey has an insufficient interest in regulating securities dealers who sell to out-of-state buyers. It is undisputed that the purpose of securities registration laws is to prevent fraud before it happens, and S 60 serves such a prophylactic purpose. Merrick v. N.W. Halsey & Co., 242 U.S. 568, 587 (1917);[14] Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559, 564 (1917) (upholding Blue Sky Law designed "to prevent fraud in the sale and disposition of stocks, bonds or other securities sold or offered for sale within the state"); Hall v. Geiger-Jones Co., 242 U.S. 539, 551 (1917) (upholding Blue Sky Law designed to "prevent deception and save credulity and ignorance from imposition"); Cola v. Terzano, 322 A.2d 195, 198 (N.J. Super. Ct. Law Div. 1974) (providing that the New Jersey Uniform Securities Law is intended to protect the uninitiated and to prevent frauds upon the public at large), aff'd sub nom. Cola v. Packer, 383 A.2d 460 (N.J. Super. Ct. App. Div. 1974); New Jersey v. Russell, 291 A.2d 583, 587 (N.J. Super. Ct. App. Div. 1972) (recognizing that the sale of securities is a specialized field of activity in which the potential for abuse and financial injury is great); Enntex Oil & Gas Co. (of Nevada) v. Texas, 560 S.W.2d 494 (Tex. Civ. App. 1977, writ ref'd n.r.e.), appeal dismissed for want of a substantial federal question, 439 U.S. 961 (1978). New Jersey's regulation of sales by in-state brokers to out-of-state buyers serves the legitimate purpose of preventing fraudulent transactions.

Regulating in-state offers to out-of-state buyers also serves New Jersey interests by protecting New Jersey residents from dubious securities that enter the state in the secondary market. This risk is particularly great because a

---

14.    [W]e think the [securities registration] statute under review is within

the power of the state. It burdens honest business, it is true, but burdens it only that under its forms dishonest business may not be done. This manifestly cannot be accomplished by mere declaration; there must be conditions imposed and provision made for their performance. Expense may thereby be caused and inconvenience, but to arrest the power of the state by such considerations would make it impotent to discharge its function.

Id. at 587 (emphasis added).

broker-dealer such as Goldmen could otherwise delay or even avoid the Bureau's scrutiny through an initial sale to a cooperative party outside New Jersey. Because there is no filing requirement for secondary transactions, Goldmen could arrange to "sell" a security to a friendly out-of-state party, immediately buy back the security, and then sell it freely to New Jersey residents using possibly questionable sales practices. App. 77-78.15 New Jersey's most effective means of preventing such an undesirable result would be to block the initial public offering. See Long, S 3.04[3][b-c] at 3-52 to 3-53.

In conclusion, the Bureau's application of S 60 to Goldmen's Imatec offering furthers two legitimate state interests: preserving the reputation of New Jersey broker-dealers, and protecting New Jersey buyers in the secondary market.

IV.

Because the Bureau's application of S 60 regulates the in-state portion of an interstate transaction and furthers legitimate in-state interests, the application ofS 60 to regulate the Imatec offering does not violate the dormant commerce clause. In so holding, we note that our conclusion is in accordance with the overwhelming majority of courts that have considered dormant commerce clause challenges to blue sky laws. See, e.g., Hall, 242 U.S. at 557; Enntex Oil & Gas Co. v. Texas, 560 S.W.2d 494 (Tex. Ct. App. 1977), appeal dismissed for lack of a substantial federal question, 439 U.S. 961 (1978); Chrysler Capital Corp. v. Century Power Corp., 800 F. Supp. 1189, 1194 (S.D.N.Y. 1992); Upton v. Trinidad Petroleum Corp., 468 F. Supp. 330, 336 (N.D.Ala. 1979), aff'd on other grounds, 652 F.2d 424 (5th Cir. 1981); Oil Resources v. Florida, 583 F. Supp. 1027 (S.D.Fla. 1984), aff'd without op., 746 F.2d 814 (11th Cir. 1984); see also Loss & Seligman at 39-40 ("On the whole, it seems fair to say that there no longer need be

_____

15. Notably, there is evidence in the record that Goldmen had engaged in such practices before. App. 196-98.

19

any substantial constitutional doubts about blue sky provisions.").16

Indeed, the established heritage and near universality of the provision that Goldmen has challenged itself underscores its constitutionality. See Healy, 491 U.S. at 336–37, 109 S. Ct. at 2499. Goldmen has challenged a state provision that is an established strand in the legal fabric of securities regulation. The power that Goldmen claims would unduly burden interstate commerce is one that most states have long exercised, and that Congress has for decades expressly allowed to continue. This is not the sort of "parochial" state power that Justice Cardozo warned of in Baldwin, the broad exercise of which "would .. . invite a speedy end of our national solidarity." Baldwin, 294 U.S. at 523, 55 S.Ct. at 500.

We will therefore reverse the order of the district court dated August 21, 1997, and remand for proceedings consistent with this opinion.

_____

16. Goldmen relies heavily on Arizona Corp. Comm'n v. Media Products, Inc., 158 Ariz. 463, 763 P.2d 527 (Ariz. App. 1988), the one case that runs counter to the many upholding state blue sky laws against dormant commerce clause challenges. Media Products is distinguishable, however, because in that case Arizona sought to bar an Arizona company from selling a security outside of Arizona through an agent outside of Arizona to a buyer who was also outside of Arizona. In other words, the only connection the transaction had with Arizona was that the principal place of business of the seller was located there. See id. at 464–65; 763 P.2d at 528–29. ("Sales of the entire issue were negotiated out-of-state[,] solely
by [an] out-of-state underwriter . . . . No sales or offers of sale were made
in Arizona."). Because the offer and acceptance took place entirely outside of Arizona, Arizona's attempt to block the transaction was not an effort to regulate the in-state component of an interstate transaction, as is the case here.

20

McKEE, Circuit Judge, dissenting.

I respectfully dissent from the opinion of my colleagues. The majority recognizes New Jersey's right to regulate that portion of a multi-state transaction occurring within its borders because "one state must prevail" in a dispute that extends beyond its borders and involves residents of other states. Maj. Op. at 16. The approach the majority uses would be helpful to resolving a choice of law dispute, but it is of only limited assistance in adjudicating this dispute under the Commerce Clause. New Jersey does not allege that Goldmen's sale of Imatec stock involved fraud, and the district court concluded that fraud was not involved. See Dist. Ct. Op. at 7 ("The Bureau does not advance a single allegation of fraud"). Thus, the issue is not which state will win, but whether New Jersey's interest here is sufficient to allow it to prevent Goldmen from soliciting residents of other states. The district court concluded, "the Bureau is reaching out to prohibit a sale, not made to New Jersey residents, which takes place in a national securities market, and which is regulated by each state to protect its own citizens." Id. The district court concluded that New Jersey's interest was not sufficient to allow that result. I agree, and would affirm the well reasoned decision of the district court.

I.

My colleagues cite General Ceramics Inc. v. Firemen's Fund Ins. Co., 66 F.3d 647, 656-59 (3rd Cir.) to justify the conclusion that New Jersey's interest in regulating offers made from within its borders justifies preventing Goldmen from offering shares of Imatec to buyers residing in states where that security is properly registered. Maj. Op. at 15.

In Firemen's Fund, the issue was

> whether New Jersey or Pennsylvania law controls the
> interpretation of an exception to a pollution-exclusion
> clause when New Jersey has significant contacts with
> the insurance contract and the insured but
> Pennsylvania is the site of the hazardous waste site
> giving rise to the liability for which coverage is sought.

21

Id., at 649. The dispute arose in a diversity case where we applied New Jersey's choice of law rules to determine if the law of New Jersey or Pennsylvania governed the interpretation of an exception to a pollution-exclusion clause in a comprehensive liability insurance policy. The loss that gave rise to the dispute resulted from costs incurred under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"). Our analysis focused upon which state's law controlled"whether the phrase `sudden and accidental' extended coverage for the gradual discharge of pollution." Id., at 652. We held that New Jersey law applied. Id. ("Based on the strong public policy that underlies New Jersey's broad interpretation of the pollution-exclusion exception,. . . New Jersey law governs."). We reached that result because the interests of Pennsylvania would not have been furthered by applying its law to that particular dispute, whereas the interests of New Jersey were furthered by applying the law of New Jersey. Id., at 657.

That does not assist us here. The controversy here is not merely between the conflicting regulations of two or more states. Rather, this dispute focuses upon the impact of that conflict upon interstate commerce. Nor, do I believe that the Blue Sky Cases[1] support the majority's conclusion. Although those cases do address the scope of the restrictions imposed on states under the Commerce Clause, they do not address the precise issue that Goldmen raises. In Merrick, (one of the Blue Sky Cases) the Court did not even address whether the Blue Sky Law at issue violated the Commerce Clause. Instead, the Court reserved that question for decision in Geiger-Jones v. Hall – a companion case to Merrick. See Merrick, 242 U.S. at 590. In Hall, the Court reviewed an Ohio law that required sellers of securities to obtain a license before offering any securities for sale within the state. An Ohio securities broker with clients in several states including Ohio (Geiger-Jones) brought a multi-faceted challenge to the legality of Ohio's licensing requirement. The primary assertion was that

_____

1. Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S. Ct. 217 (1917), Caldwell v. Sioux Falls Stock Yards Co., 242 U.S. 559, 37 S.Ct. 224 (1917) and Merrick v. N.W. Halsey & Co., 242 U.S. 568, 37 S.Ct. 227 (1917).

22

Ohio's licensing requirement was an improper exercise of the state's police power. 242 U.S. at 548. The Court concluded that the requirement was a valid means of protecting against fraud, and noted that the Commissioner's ability to deny or revoke a license was qualified by a duty of good faith, and subject to judicial review. Id., at 553. The Court reasoned:

> The provisions . . . apply to dispositions . . . within the state, and while information of those issued in other states . . . is required to be filed, they are only affected by the requirement of a license of one who deals in them within the state. Upon their transportation into the state there is no impediment, -- no regulation of them or interference with them after they get there. There is the exaction only that he who disposes of them there shall be licensed to do so, and this only that they may not appear in false character . . . and this certainly is only an indirect burden upon them as objects of interstate commerce, if they may be regarded as such. It is a police regulation strictly, not affecting them until there is an attempt to make disposition of them within the state. Such regulations affect interstate commerce in them only incidentally.

242 U.S. at 557-8 (emphasis added). Here, the regulation in question has a far greater impact upon commerce outside of the state. It prevents solicitation of residents of other states and thereby has the practical effect of halting sales to individual purchasers unless those purchasers know of the securities and make Goldmen an unsolicited offer to buy. In fact, the Bureau's entire justification for S 60 rests upon its admitted desire to stop such solicitations, and thereby stop solicited sales. Therefore, it is as misleading as it is inaccurate to conclude that the extraterritorial affect of S 60 is "incidental" and to uphold the prohibition as a regulation of New Jersey's "half" of an interstate transaction. See Maj. Op. at 16. Themajority states:

> If New Jersey seeks to block Goldmen's offering but the buyer's state (say, New York) would allow it, one state must prevail. One state can in effect "force its judgment" upon the other. . . . block the transaction even if New York would permit it.

23

> Goldmen's alternative is no better, however: under its view of the dormant commerce clause, New York's approval would permit the transaction, over New Jersey's objection. Thus, the difference between New Jersey's Blue Sky law and Goldmen's proposal is simply the market's default rule: should the transaction be allowed if either state permits, or blocked if either side objects? Such questions of the market's "structure" and its "method of operation" are quite simply beyond the concern of the Commerce Clause, as they "relate to the wisdom of the statute, not to its burden on commerce." Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127–28 (1978).

Maj. Op. at 16. However, applying S 60 to bar solicitation where a security could otherwise be sold goes to the very heart of the Commerce Clause. The question is not which state's regulations will prevail, but whether either state has an interest of sufficient gravity to allow it to enforce its regulations in a manner that so effects interstate commerce. The majority's analysis focuses only upon the interest of the inconsistent regulatory schemes in the relevant "competing" states. That approach fails to afford proper recognition of the overriding federal interest that must control under a Commerce Clause analysis. See Kassell et al. v. Consolidated Freightways Corp. 450 U.S. 662 (1981).

In Kassell, an interstate trucking company sought to strike down an Iowa law that limited the size of trucks on interstate highways in Iowa to 50 feet. Consolidated Freightways sought to invalidate the restriction arguing it burdened interstate commerce. Neighboring states, and nearly all other states in the west, and midwest allowed trucks up to 65 feet in length on the portion of interstate highways within their borders. Accordingly, interstate trucking companies had to either use shorter trucks to transport cargo through the midwest, route cargo around Iowa, or switch trailers at the Iowa border in order to insure that they did not exceed Iowa's length restriction. The Court concluded that Iowa's proffered justification of safety was tenuous at best because the record did not establish that reducing trailer size had as direct an impact on the safety of an interstate highway as Iowa claimed.

24

> Regulations designed for [safety] nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause. . . . In [Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, (1978)] we declined to accept the State's contention that the inquiry under the Commerce Clause is ended without a weighing of the asserted safety purpose against the degree of interference with interstate commerce. 434 U.S., at 443, 98 S.Ct., at 795. This "weighing" by a court requires-- and indeed the constitutionality of the state regulation depends on-- a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce.

Id. at 670 (internal quotation marks omitted).

Although it appears at first that Kassell can easily be distinguished from the facts before us, I believe the ease with which Kassell can be dismissed is somewhat illusory. The distinction stems from the tangible nature of the commerce involved in Kassell rather than the quality of its relationship to interstate commerce. The impact of a regulation upon trucks moving on interstate highways is readily apparent. The impact of S 60 upon commerce outside of New Jersey is intangible, but nevertheless real. New Jersey's interest here is not prevention of fraud because fraud is not alleged. Thus, I disagree with the weight the majority attaches to New Jersey's claimed interest in protecting the reputation of securities dealers that sell from offices in New Jersey. Maj. Op. at 17. New Jersey's attempt to preserve S 60 by pointing to its legitimate interest in preventing fraud is not unlike Iowa's attempt to preserve its regulation by arguing that it furthered the safety of its interstate highways in Kassell. That argument was not supported by the record there, and the fraud argument is not supported by the record here. New Jersey can not prevent the sale of a security in a state where the sale is proper merely by alleging a concern for the speculative nature of Imatec, and alleging concerns regarding Goldmen's business practices. If Goldmen (or any other broker) engages in misleading and improper business

25

practices in the sale of Imatec stock (or any other stock or commodity for that matter) New Jersey can certainly investigate and remedy the situation under its police powers. See Merrick, supra. The Bureau can prohibit fraud in the offer, sale and purchase of securities, N.J.S.A. 49:3-52; it can prohibit misleading filings, N.J.S.A. 49:3-54; it can prohibit unlawful representations concerning registration, N.J.S.A. 49:3-55; it can conduct investigations, subpoena witnesses and require the production of evidence, N.J.S.A. 49:3-68; and it can enjoin illegal conduct, N.J.S.A. 49:3-69.

Accordingly, the majority's citation to Stevens v. Wrigley Pharma. Co., 154 A. 403, 403 (N.J. Ch. Div. 1931) (noting that New Jersey's interest in regulating in-state offers to out-of-state buyers is "not so much to protect the citizens of other states, as to prevent this state from being used as a base of operations for crooks marauding outside the state."), and Simms Inv. Co. v. E.F. Hutton & Co., 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("[T]he laws protect legitimate resident issuers by exposing illegitimate resident issuers."), is misplaced. See Maj. Op. at 17. If that is New Jersey's interest here, let the Bureau allege and prove fraud. We are far too quick to allow New Jersey to proceed as though it had established a fraud it is not even alleging. We ought not rest our decision here upon concerns that arise from insinuations and implications about unproven, and unalleged, conduct on the part of Goldmen.

The majority also relies upon New Jersey's ability to regulate "in-state offers to out-of-state buyers" stating that such an interest "also serves New Jersey interests by protecting New Jersey residents from dubious securities that enter the state in the secondary market." Maj. Op. at 18. Yet, S 60 does not do that. Goldmen can solicit sales of Imatec shares to institutional buyers, and other broker-dealers no matter where they are located. Similarly, he can sell these shares to individuals in New Jersey and elsewhere so long as he does not solicit the buyer. Once any such sales occur, the shares are in the secondary market and Goldmen is no longer restrained by S 60.2

_____

2. The Bureau takes the position that individuals who make an unsolicited offer to buy from Goldmen, and institutional buyers and

26

II.

The Supreme Court "has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause." Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 578-79 (1986). "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [the Supreme Court] has generally struck down the statute without further inquiry." Id. at 579. "When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the Court] has examined whether the State's interest is legitimate and whether the burden on interest commerce clearly exceeds the local benefits." Id. (citing Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).

Although I believe a strong case can be made that S 60 falls within the first tier of inquiry and therefore could be struck down as a per se violation of the Commerce Clause, I think our inquiry should, more appropriately, be conducted under the Pike balancing test that guides inquiry under the second tier.3

Although the majority does not directly refer to Pike v. Bruce Church, it is obvious that, by discussing New Jersey's
_____

other broker-dealers are better informed. The Bureau reasons that extremely risky securities will, therefore, not enter New Jersey via the secondary market as they won't be sold in the first place. However, these better informed buyers may well purchase shares of even the riskiest stock based upon a belief that the risk is offset by the selling price, and the potential for greater profit. For a discussion of the various theories of how risk, information about an issuer, and potential profit are factored into the selling price of shares of stock, see Robert G. Newkirk, Comment, Sufficient Efficiency: Fraud on the Market in the Initial Public Offering, 58 U. Chi. L. Rev. 1393 (1991).

3. The Supreme Court has "recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the Pike v. Bruce Church balancing approach." Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. at 578-79."In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." Id.

local interests, it is engaging in a balancing of interests as required by Pike. In Pike, the Court wrote:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the local putative benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, but more frequently it has spoken in terms of "direct" and "indirect" effects and burdens.

397 U.S. 137, 142 (1970).

Moreover, a state cannot impose its regulatory scheme on another state in an effort to "control conduct beyond the boundaries of the state." Healy v. Beer Institute, 491 U.S. 324, 326 (1989). This prohibition against extraterritoriality "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual states with their respective spheres." Id. The Supreme Court has summarized the application of the limitations inherent in the Commerce Clause as follows:

> [O]ur cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following propositions: First, the Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State. . . . Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was

28

intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another.

Id. at 336-37 (citations and internal quotations omitted).

I agree that Goldmen's telephone solicitation of out-of-state buyers for shares of Imatec would not be a transaction occurring "wholly outside" of New Jersey. However, the majority's view that the Bureau is only regulating its "half" of a transaction by prohibiting Goldmen from soliciting out-of-state buyers, see Maj. Opn. at 16, is accurate in theory, but not accurate in the jurisprudential reality of the Commerce Clause. Goldmen is not the issuer of these securities. It is only the underwriter. Imatec, a Delaware corporation whose main office is in New York, is the issuer. Imatec's only connection with New Jersey is that its offering was underwritten by a broker-dealer who happens to be located there, and that broker dealer planned to solicit out-of-state sales from its New Jersey office. It may be reasonably assumed that out of state buyers would purchase these shares from funds held in financial institutions outside of New Jersey, and that any profits would be deposited into those same financial institutions. Moreover, the growth and fiscal strength of Imatec, the Delaware corporation, is related to the value of its shares. Thus, New Jersey's only connection with this interstate transaction lies in the fortuitous circumstance that a broker-dealer would be sitting at a desk somewhere in New Jersey making telephone calls to residents of the 16 states where Imatec securities are appropriately registered and authorized for purchase.

29

Goldmen has satisfied the registration requirements of 16 states and those states allow their residents to be solicited to purchase shares of Imatec. Each of those states could have enacted a regulatory scheme that only allowed the sale of securities properly registered in the state where the seller maintains its principal office. None of the 16 states have chosen to do so. Our holding has the practical effect of reading S 60 into the regulations of each of those states despite the absence of such a restriction in the regulatory schemes of the 16 states. The majority concludes that this result is consistent with the Commerce Clause because it furthers two "particularly strong" local interests, viz., preserving the reputation of New Jersey broker-dealers and protecting New Jersey buyers in the secondary market. Maj. Opn. at 17-19. My colleagues can reach this conclusion by viewing S 60 as having only an "incidental" impact on interstate commerce. As I state above, S 60 imposes an absolute ban on interstate commerce that consists of soliciting individual buyers of Imatec stock from New Jersey. If we analyzed the regulation from the perspective of that absolute ban on the solicited sale of Imatec securities to residents of the states where the securities have been approved for sale, the burden on interstate commerce would be far more substantial than the majority suggests.

However, even assuming arguendo that the regulations at issue here have only an "incidental" effect on interstate commerce, New Jersey's interest is still not sufficient to justify prohibiting solicitations in 16 states where these securities are registered. I believe that finding such an interest requires more than the asserted need to protect potential purchasers residing elsewhere from the risks of penny stocks and sellers such as Goldmen. It requires some showing that the interests New Jersey seeks to further would be advanced by applying S 60 to solicitations of Imatec. If the Bureau can establish that Goldmen is engaging in false and misleading sales practices or fraud, New Jersey has an interest sufficient to survive scrutiny under the Commerce Clause. But, the Bureau concedes that "[t]his is not a fraud case." App. at 558. Therefore, I am at a loss to understand how the majority can conclude on the record before us that New Jersey has shown a "particularly strong" interest.

Since New Jersey's interest absent fraudulent business activities is minimal at least, the federal interests are paramount. It is not a question of allowing one state's regulatory scheme to prevail over that of another state. "The balance here must be struck in favor of the federal interests." Kassell, 450 U.S. at 667. Accordingly, I believe we should affirm the decision of the district court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

31